**Bettye Joe BAKER et al., Plaintiffs,**

**v.**

**COLUMBUS MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants.**

**No. EC 70–52.**

United States District Court, N. D. Mississippi, E. D.

June 23, 1971.

Stephen J. Pollak and David Booth Beers, of Shea & Gardner, Washington, D. C., T. H. Freeland and G. A. Gafford, of Freeland & Gafford, Oxford, Miss., for plaintiffs.

Shields Sims, of Sims & Sims, Columbus, Miss., for defendants.

ORMA R. SMITH, District Judge.

### FINDINGS OF FACT ON COUNT ONE

1. Plaintiffs in Count One of this action are the National Education Association (NEA), the Mississippi Teachers Association (MTA) and eight Negro teachers who taught in the Columbus Municipal Separate School District during the academic year 1969–70—Bettye Joe Baker, Willie Louis Dillard, Ester Harrison, Mildred Patricia Hubbard, Jesse Jones, Annie D. Prowell, Albert Williams, Jr., and Camille Burnadette Yates.

2. The NEA is a nationwide professional organization for educators. It has a direct interest in the standards and procedures used to employ teachers and frequently provides legal assistance to educators when their professional or civil rights are at stake. The MTA is a statewide professional organization for teachers and is an affiliate of the NEA. Most of its members are black. MTA members pay annual dues of $15.00. Some of the plaintiff teachers are members of the MTA.

3. The defendants are the Columbus Municipal Separate School District of Lowndes County, Mississippi; its Superintendent, James E. Goolsby; and its

Board of Trustees, Carl McKellar, J. H. Edmonson, Tom Harvey, Jr., Mrs. John Holloman, and James M. Trotter. The Superintendent and the Board of Trustees are named as parties in their individual and official capacities.

4. Count One of the amended complaint alleges that defendants have unlawfully refused to reemploy black teachers and to hire black applicants for teaching positions. Plaintiffs pray, *inter alia*, for a permanent injunction preventing defendants from requiring inservice teachers and applicants for teaching positions to achieve a score of 1000 or more on the National Teachers Examination (NTE) as a pre-condition to retention and employment in the system. The amended complaint also seeks to recover costs, attorneys fees and damages sustained by those plaintiffs who were not reemployed by defendants for the academic year 1970–71 because of the test-score requirement. Defendants have denied the material allegations of the amended complaint and they deny that plaintiffs are entitled to any relief.

5. Pursuant to Rule 65(a) (2) of the Federal Rules of Civil Procedure, and the agreement of the parties, the trial on the merits was consolidated with the hearing on plaintiffs' motion for preliminary injunction and held on September 1 and 2, 1970. Following the hearing and closing arguments of counsel, this Court entered a preliminary injunction on September 3, 1970, requiring defendants to reemploy those teachers who had not obtained teaching positions for the 1970–71 school year, namely, Bettye Joe Baker, Mildred Patricia Hubbard, Jesse Jones and Melinda Blackmon.

*The Racial Composition of the Columbus Municipal Separate School District.*

6. During the academic year 1969–70, the student enrollment in the Columbus Public School was 8,865 students. The racial composition of the student body was approximately 5,392 white students or 61 per cent white, and approximately 3,473 black students or 39 per cent black.

7. At least until the commencement of the 1970–71 school year, the defendants operated a dual school system. In that system there was one white high school for grades 10–12; two white intermediate schools for grades 7–9; six white elementary schools for grades 1–6; one black school for grades 7–12; two black schools for grades 1–7; and two black elementary schools for grades 1–6. In 1969–70, all of the black schools were administered by black principals and all of the white schools by white principals. Eleven white teachers taught in the black schools and five black teachers taught in the white schools during the 1969–70 school year.

8. During August 1970, this Court entered a consent decree agreed to by the Columbus School District and the United States which required the district "beginning with the 1970–71 school year, [to] begin to operate a unitary system as required by the Supreme Court of the United States in Alexander v. Holmes County Board of Education * * *" and "permanently enjoined [defendants] from discriminating on the basis of race * * *." United States v. Columbus Municipal Separate School District et al., Civ. No. EC 70–55–S. The order expressly incorporated the provisions of the *Singleton* decree. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969) (en banc).

9. Defendants intended to reduce the size of the faculty by three positions for the 1970–71 school year. On the day before school opened, however, Superintendent Goolsby advised the Court that there were 36 vacancies on his staff. Thus, the 1970–71 school year commenced with a faculty that was 39 persons below the faculty for the preceding academic year, 1969–70. In all, there were 376 faculty members in 1969–70 and 337 faculty members as of September 3, 1970.

10. Between the academic years 1969–70 and 1970–71, the racial composition of the faculty changed substantially. The number of black teachers dropped from 133 to 103 and the number of white teachers dropped from 243 to 234. Thus, the number of black teachers on the faculty declined by 22 per cent and the number of white teachers on the faculty declined by 3 per cent.

11. Through September 3, 1970, defendants had hired 44 new teachers for the 1970–71 academic year. All but one were white.

12. The marked changes in the racial composition of defendants' faculty between the academic years 1969–70 and 1970–71 coincide with the changes in defendants' hiring and retention policy. On January 12, 1970, the Board of Trustees modified the procedures and requirements for hiring and reelection of teachers by adding to those procedures and requirements, effective for the 1970–71 academic year, the following:

Each classroom teacher that was employed to teach in the Columbus Public School System for the first time for the year 1969–1970 [shall] be required to have on file in the Superintendent's office a composite score of 1000 on the National Teachers Examination before they [shall] be considered for employment as a classroom teacher for the year 1970–71 and * * * all classroom teachers that were not employed by the Columbus Public Schools during the 1969–70 school year and all future classroom teachers that are employed [shall] be required to meet the above standards.

*The Standards and Procedures Governing the Selection of New Teachers in Effect Prior to the Academic Year 1970–71.*

13. Prior to January 12, 1970, the Columbus School District did not actively recruit new teachers. The central office provided application forms to candidates making inquiry. The form requested the applicant to supply personal and professional information including: prior education; teaching certificates; teaching experience; names, addresses, and occupation of six references; and the positions desired by the applicant. In addition, the applicant was requested to submit with the application form a picture and a transcript of credits.

14. Application forms completed by the candidate were kept on file in the central office so that principals could cull through them when they had vacancies to fill. In the event a principal decided to pursue an application, he would request the applicant's references and would interview the applicant. Then the principal, if so inclined, would recommend the applicant to the Superintendent.

15. The Superintendent would review the file of the recommended applicant and decide whether to recommend the applicant to the Board of Trustees. That Board made the final decision as to all new hires.

*The Standards and Procedures for Reemployment of In-Service Teachers which Were in Effect Prior to the Academic Year 1970–71.*

16. Mississippi teachers do not have the protections of a State teachers' tenure statute.

17. In March of each year all teachers in the Columbus School System have been asked to file forms stating whether they wish to be reelected for another year.

18. Also in or about March of each year, each principal has evaluated the teachers in his school on the basis of a rating form used throughout the school district. The principals rated the teachers on a scale of 0 to 5 with respect to each of 25 criteria:

Wholesome Personality
Appearance
Poise
Desirable Work Habits
Good Command of English
Good Physical and Mental Health
Proper Ethical Conduct

Interest in Self Improvement

Knowledge of Subject Matter and Methods of Instruction

Academic Requirements of Subject Matter or Grade Level

Willingness to Accept and Execute Policies and Assignments

Readiness to Share Ideas and Methods

Skill in Evaluating Pupils and Reporting to Parents

Willingness to Ask for and Accept Help

Participation in Professional Organizations and School Activities

Competency in Record Keeping

Follows Philosophy of Education for Columbus Public Schools

Concern for Physical Aspects of Room

Self-Discipline and Classroom Control

Consistency in Lesson Planning

Energy and Enthusiasm in Presenting Lesson

Skill in Giving Directions, Questioning and Testing

Use of Teaching Aids

Skill in Making Reasonable Homework and Research Assignments

Providing for Individual Instruction During Supervised Study Period

19. The rating form was first used in the 1964–65 school year. It was developed by committees of teachers and principals because Superintendent Goolsby was of the view "that we should prepare our own evaluative instrument rather than use one prepared by 'outsiders' who were totally unaware of our philosophy of education or the conditions which prevail in our particular school system." In introducing this rating form to the Columbus School District, Superintendent Goolsby stated that the evaluation form was "by far the best one we have ever had." The form has been published in the *Teacher's Handbook* and distributed to all teachers.

20. Annually, each principal rated the teachers assigned to his school on each of the 25 criteria, submitted the rating forms to the Superintendent and also made a recommendation in writing as to the teacher's reelection for the coming school year.

21. Prior to January 12, 1970, an in-service teacher receiving a favorable recommendation from his principal was virtually assured of being reelected. Superintendent Goolsby, who made final recommendations to the Board of Trustees, could not recall vetoing any in-service teacher recommended by a principal in the past three years and he could not recall any instance when the Board had failed to follow the Superintendent's recommendation regarding reelection during this period.

### The New Policy for Hiring and Reelection.

#### The "Voluntary Professional Enrichment Program"—PEP.

22. The NTE cutoff score requirement had its origins in a merit pay program of defendants known as the "Voluntary Professional Enrichment Program" or "PEP."

23. On February 14, 1966, Superintendent Goolsby proposed a merit pay program to the Board of Trustees. The Board adopted the PEP program on April 29, 1966, effective for the 1966–67 school year. The PEP program was formulated by the Superintendent, who consulted with a committee of teachers belong to the local white teacher association. No black teachers were consulted.

24. Under PEP no teacher was eligible for merit pay unless he had filed an NTE score with the school district. In addition, a teacher had to earn 70 points to qualify for the minimum pay increment of $300; 75 points for an increment of $400; and 80 points for the maximum increment of $500.

25. A teacher could earn up to 40 PEP points on the basis of the principal's evaluation, up to 30 points for post-graduate training or approved travel and up to 30 points for scoring 575 on both the NTE Common Examination and Teaching Area Examination. In connection with the NTE, a teacher could earn PEP points by attaining a score of more than 500 on either of the component ex-

aminations of the NTE. Thus, a teacher could obtain between 5 and 10 points by scoring between 500 and 575 on the Common Examination of the NTE and also could obtain between 14 and 20 additional points by scoring between 500 and 575 on the Teaching Area Examination of the NTE.

26. Under PEP it was theoretically possible for a teacher to obtain the minimum increment of $300 without scoring 500 on either the Common Examination or the Teaching Area Examination of the NTE provided the teacher filed a score. To earn increment under these circumstances, the teacher would have to have been ranked in the first decile of his school, thereby earning 40 points, and would have to have obtained 30 hours of post-graduate work or the equivalent in travel, thereby earning 30 points. Teachers not meeting these two standards could earn merit pay only by making a score of 500 or more on the Common Examination or the Teaching Area Examination of the NTE.

27. During the first year of PEP (1966–67), 59 teachers applied for merit pay and filed NTE scores. Five of the applicants were black. Fifty-two white teachers and one black teacher posted scores of 500 or more on one of the NTE examinations. Twenty-six applicants, all of whom were white, received merit pay.

28. In the second year (1967–68) of PEP, 77 teachers applied for merit pay. Seven of these applicants were black. Sixty-eight white teachers and one black teacher posted scores of 500 or more on one of the NTE examinations. Forty-three of the applicants, all of whom were white, received merit pay.

29. In the third year (1968–69) of PEP, 98 teachers applied for merit pay. Fifteen of these applicants were black. Seventy-nine white teachers and eight black teachers posted scores of 500 or more in one of the NTE examinations. Fifty-six teachers, of whom four were black, received merit pay.

*Steps Leading to the Board's Resolution of January 12, 1970.*

30. The evidence shows that the Board of Trustees first considered requiring all teachers to file NTE scores at its meeting on July 15, 1968. The minutes of the Board state:

"Discussion of NTE scores. There was a discussion of requiring all teachers employed by the Columbus Public Schools to have a National Teacher Examination score on file as a condition of employment. It was decided that the superintendent would make recommendations with regard to this matter at a later date, after talking with the principals and teacher groups. The meeting was then adjourned."

31. This action of the Board followed closely on the heels of two court rulings which indicated that faculty desegregation was imminent. On May 27, 1968, the Supreme Court had ordered school boards "to come forward" with desegregation plans that promise "realistically to work, *now*," Green v. County School Board of Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716, 724; and on June 3, 1968, the Court of Appeals for the Fifth Circuit declared that as to faculty desegregation "full compliance should be reached by the opening of the school year 1970–71," United States v. Board of Education of City of Bessemer, 396 F.2d 44, 52.

32. Superintendent Goolsby does not remember doing anything pursuant to the Board of Trustees' discussion on July 15, 1968.

33. On April 14, 1969, Mrs. Holloman moved the Board of Trustees "to require new teachers elected to the Columbus Public Schools faculty for the first time for the 1969–70 school session to file their National Teacher Examination scores by January 1, 1970." The motion carried. At this meeting the Board considered establishing a cutoff score but decided to make that determination later.

34. On October 29, 1969, the Supreme Court ruled that Mississippi school systems before it in that case must convert "immediately" to unitary systems, Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19, and on December 1, 1969, the Fifth Circuit, sitting en banc, issued its decision in Singleton v. Jackson Municipal Separate School District, *supra.*

35. On January 12, 1970, the Board of Trustees adopted its rule requiring all teachers employed in the Columbus system for the first time for the 1969–70 school year and all applicants for teaching positions to attain a combined score of 1000 on the Common and Teaching Area Examinations of the NTE in order to qualify for employment in the system for the 1970–71 school year and beyond.

36. The NTE cutoff score requirement was invoked by defendants without investigating or studying the validity and reliability of the examination and the particular cutoff score as a means of selecting teachers for hiring and reelection for the Columbus system, and without consulting with the developer of the NTE. The Superintendent disavows any expertise with respect to the NTE.

37. The Board of Trustees, in adopting the cutoff score on January 12, 1970, was aware of the racially disparate results worked by the NTE requirements of the PEP program. The Superintendent also expected that the percentage of black teachers or applicants who would not qualify would be greater than the percentage of whites.

38. The requirement for a 1000 NTE score was not announced to the faculty until the end of March 1970 when Superintendent Goolsby advised his principals to inform plaintiffs and other teachers that their contracts had not been renewed because of their failure to make the NTE cutoff score of 1000.

### The National Teachers Examination.

39. Educational Testing Service (ETS), a non-profit corporation, produces and administers the National Teachers Examination. It also designs, produces and administers a broad range of other standardized testing programs, including the College Board Examinations, the Law School Aptitude Test, and the Graduate Record Examinations. ETS annually administers test programs to about five million individuals who are in or moving toward professional careers.

40. There are two major sections of the NTE: the Common Examination and the Teaching Area Examination. The Common Examination consists of a professional education test and a set of three general education tests which provide a general appraisal of the prospective teacher's basic professional preparation and general academic attainment. The Teaching Area Examinations test the candidate with respect to a particular academic discipline. There are about 20 different Teaching Area Examinations. Separate scores are reported by ETS for the Common Examination and for the Teaching Area Examination.

41. Plaintiffs presented as their expert witness Dr. James R. Deneen, Senior Program Director for Teacher Examinations of the ETS. Prior to joining ETS in 1969, Dr. Deneen was a full-time consultant to the Ford Foundation in matters of school administration. In earlier years, he was the Codirector of Education Study in the Catholic Archdiocese of New York; an Adjunct Professor at Fordham University, teaching school personnel administration; and Executive Secretary for the Superintendent of the National Catholic Education Association; and between 1957 and 1966 the Superintendent of Schools for the Catholic Diocese of Evansville, Indiana, a system of 16,000 pupils.

42. Defendants presented as their expert witness Dr. Stephen Knezevich, Professor of Education Administration at the University of Wisconsin. Prior to serving at the University of Wisconsin, Dr. Knezevich was associated with the American Association of School Administrators. In earlier years, he served

as Professor and Department Head at Florida State University; Professor of Education at the University of Iowa; Associate Professor of Education at University of Tulsa; and Superintendent of Schools in Algoma, Wisconsin.

43. Dr. Deneen's experience with the NTE has been in his present capacity as the supervisor of the program in which the NTE is developed and administered. Dr. Knezevich's direct experience with the NTE was in 1960 when he reviewed the test and prepared a paper on the subject. Since that time, his contact with the NTE has been limited to that stemming from his relationship to the process for admission of students for the Florida State Graduate School of Administration Supervision and Curriculum between 1961 and 1965. In admitting students, that graduate school relied in part on standardized test scores, most extensively the Graduate Record Examination score, but sometimes the NTE score. With the exception of a review of some NTE booklets in preparation for his testimony in this case, Dr. Knezevich has not had any contact with the NTE since 1965.

*What the NTE Is Designed to Measure.*

44. The primary purpose of the NTE is to measure the academic achievement of college seniors completing four years of teacher education. It is limited to the assessment of those aspects of teacher education which are validly and reliably measured by well-constructed, objective paper-and-pencil tests. The NTE are used primarily by state and local school systems, teacher education institutions, and other agencies concerned with the guidance, preparation, certification and employment of teachers for elementary and secondary schools.

45. It is not known whether there is a relationship between academic preparation, as measured by the NTE, and effective teaching. Dr. Deneen testified that "We cannot demonstrate such a relationship," and Dr. Knezevich generally agreed with the conclusion. Thus, the reliability and validity of the NTE as a

means of identifying effective teachers is unknown. There is no evidence developed to date of a correlation, positive or negative, between the NTE score and teacher effectiveness. The NTE does not claim predictive validity—i. e., "the ability to forecast teaching performance."

*Defendants' Use of the NTE—Absence of Validation.*

46. Defendants rely exclusively on the NTE in refusing to reemploy first-year teachers and to hire applicants who have not satisfied the 1000 cutoff score requirement.

47. Use of the NTE with a cutoff score as a means of selecting teachers cannot be considered reasonable unless steps are first taken to relate the score to experience and needs in the particular school district. These steps include identification of the strengths and weaknesses of the school district's present staff; determination of the characteristics of teacher preparation programs in those colleges from which the district draws most of its teachers; determination of the composition and needs of the district's student body in relation to national and local education goals; and consultation with ETS regarding the uses to which the examination can be put in meeting the districts' goals and the tests' limitations.

48. In making a decision not to reemploy an in-service teacher or not to employ an applicant solely on the basis of the NTE, an administrator runs great risks of arbitrary and unreasonable results in the absence of information which relates academic qualities to teaching success in his district.

49. The defendants did not take the steps necessary to guard against arbitrary results in using cutoff scores on the NTE as a means of selecting teachers for reemployment and employment.

50. Superintendent Goolsby recognized the danger of arbitrary results in using the NTE. He testified that in setting the 500 scores for the PEP pro-

gram, the School District "was not saying that teacher who scores 500 would be a good teacher. It would not say that she would be a bad teacher either."

*Defendants' Use of the NTE—Impropriety of Making the NTE the Sole Criteria for Hiring and Reemployment.*

51. The likelihood of arbitrary results from use of the NTE with a cutoff score is enhanced because the NTE measures only a fraction of the characteristics required for effective classroom performance.

52. The NTE examinations are not measures of classroom teaching performance. Dr. Deneen testified: "The test does not get at, does not examine, * * * many areas which school superintendents or a state may wish to know about prospective teacher candidates. It cannot, for example, supply what one can learn uniquely through a personal interview." Among the qualities required of teachers which the NTE does not measure are: possession of manual skills, attitudes about children, personal and social characteristics, ability to communicate with students, ability to motivate students, ability to discipline students, ability to evaluate students, capability to maintain satisfactory relationships with parents of students, capability to maintain satisfactory relationships with fellow teachers and, most important, whether the teacher can function effectively in the classroom.

53. In his paper on the subject, Dr. Knezevich observed:

The examinations do not purport to measure such things as personal and social characteristics. Those responsible for the examinations are quick to point these things out and urge the National Teacher Examinations result be supplemented with the result of other evaluations of techniques before any final decision is made to the prospective teacher's qualifications.

The National Teacher Examinations were constructed to provide objective measures of some of the intellectual, academic, and cultural factors basis [sic] for teacher success. Any school official or other person who is judging the teacher fitness of a candidate should not use the National Teacher Examinations result as a sole basis for selection. Due cognizance should be taken of such factors as personality, social characteristics, training, experience, and classroom effectiveness. These should be evaluated independently by local school officials through interviews, observations of classroom procedures, and careful consideration of records and credentials.

54. The NTE tests in some degree for only four of the 25 criteria used by defendants to evaluate in-service teachers—namely, knowledge of subject matter and methods of instruction; academic requirements of subject matter or grade level; skill in giving directions, questioning and testing; and use of teaching aids. It does not purport to evaluate or measure a teacher's strengths or weaknesses in the 21 other criteria which defendants sincerely believe will help teachers progress toward or maintain superior teaching.

55. With respect to new hires, it was unreasonable for defendants to exclude teacher applicants on the sole basis of a score on the NTE which had never been validated.

56. With respect to in-service teachers, it was even less justifiable for defendants to exclude teachers from reemployment on the sole basis of a score on the NTE because other, more probative means of evaluation were available. As Dr. Deneen testified:

The best indication that a teacher can teach well is that he has taught well. to a supervising principal the observable qualities of a teacher's class preparation and presentation, his abilities to communicate with students, to motivate, discipline and evaluate them, his relationship with parents and fellow teachers are all important criteria. When this information is available a

cut-off score based on equal attention to all sections of the NTE is improper.

*The NTE Cutoff Score Has Fallen More Heavily on Black Teachers and Candidates than upon Whites.*

57. Prior to the time this case was heard, defendants had hired 43 new white teachers and one new black teacher for the 1970–71 school year. There were 18 in-service black teachers who were required to attain scores of 1000 on the NTE in order to be eligible for reemployment for 1970–71. Only one of these teachers achieved that score. There were 73 in-service white teachers who were required to attain scores of 1000 on the NTE to be eligible for reemployment for 1970–71. Four reported low scores and five reported no score.

58. ETS made a computer check of the NTE scores achieved by students reporting attendance at predominately white and black institutions of higher learning in Mississippi during the four most recent administrations of the examination prior to the hearing in this case—July and November 1969, and January and April 1970. The racial makeup of these institutions was determined from the Department of Health, Education and Welfare's publication reporting the enrollment by race in Mississippi institutions.

59. ETS's study of scores at Mississippi institutions show that about 90 per cent of the students graduating from predominately white institutions score 1000 or better on the NTE, while 89 per cent of the students graduating from predominately black institutions fail to attain a score of 1000.

60. Roughly 75 per cent of the teachers hired by defendants are graduates of Mississippi institutions of higher education.

61. The NTE cutoff score requirement will continue to disqualify substantially more black applicants for teaching positions in defendants' system than white applicants for the next few years.

62. The cutoff score requirement has yielded results which are contrary to the defendants' avowed purpose of upgrading the faculty. The responsible supervising principals had evaluated each of the plaintiffs on each of the 25 criteria set forth in Defendants' Teacher's Handbook and thereafter recommended them for reemployment. One of these plaintiffs, Mr. Jones, was ranked by his principal first on the faculty of 21 at his school.

63. The NTE cutoff score requirement eliminated other teachers who, in the first year of their association with the Columbus schools, fell in the middle range of teachers as evaluated by their principals. P. Adams ranked $19/31$ at her school; M. Blackmon ranked $31/61$; Mr. Ceasar ranked $20/61$; W. Dillard ranked $35/61$; and C. McKay ranked $7/14$.

64. Adams was described by her principal as "an average teacher;" Blackmon was credited with having "done an excellent job after assuming the position, has good relationships, has a good program going;" Caesar was evaluated as "very dependable, concise, personable;" Dillard had "shown enthusiasm in work, good relationship with students;" Baker "knows subject matter very well, good relationship, dependable."

65. The cutoff score requirement has prevented the defendants from maintaining a full faculty. In prior years, it has not been necessary for defendants actively to recruit teachers. On the eve of the academic school year 1970–71, defendants had 36 vacancies on their teaching force.

66. If the Superintendent fills these vacancies with substitute teachers, who are not required to score 1000 on the NTE, he would be using people who, according to his testimony, "are not in all instances real qualified school teachers."

*Unequal Application of the NTE Requirement.*

67. The NTE cutoff requirement has been applied in a racially discriminatory manner. One first-year white teacher

who failed to attain the cutoff score was reemployed for the 1970–71 school year. No black teacher who failed to attain the NTE cutoff score was reemployed for 1970–71.

68. Two black teachers—plaintiffs Prowell and Hubbard—were nonrenewed on the basis of the NTE requirement, although they were not within the class of teachers to which the requirement applied. These two teachers had begun teaching in the Columbus system during the 1968–69 school year. Mrs. Hubbard's contract, executed in her maiden name of Miller on May 14, 1969 acknowledged that she had been "duly elected" as a teacher for the year 1968–69 and specifies her salary for the duration of that year. Mrs. Prowell's contract, which was executed February 17, 1969, also acknowledges that she has been "duly elected" for the year 1968–69. The NTE cutoff requirement, by its terms, does not apply to Mrs. Hubbard and Mrs. Prowell for they are not classroom teachers "employed to teach in the Columbus Public School System for the first time for the year 1969–70".

69. Defendants, on the day before school opened, had hired 43 new white teachers and one new black teacher. At that time, there were 36 vacancies on defendants' staff.

70. Five black applicants had filed satisfactory NTE scores with their applications to the Columbus School District prior to July 14, 1970. The number had increased from five to nine by September 3, 1970. None of the applicants had been employed by defendants prior to the time when this Court entered its preliminary injunction on September 3, 1970.

### Conclusion

71. The facts surrounding the adoption and application of the NTE requirement demonstrate that defendants acted for the purpose of barring proportionately more black teachers than white teachers from reemployment and hiring by the Columbus School district.

72. The effect of the NTE cutoff score requirement has been to bar proportionately more black teachers than white teachers from reemployment and hiring by the Columbus School District.

### FINDINGS OF FACT ON COUNT TWO

73. Count Two of this action arises from defendants' refusal to employ five of the plaintiffs in its summer school program. The plaintiffs in this count are Baker, Dillard, Jones, Williams and Yates.

74. Plaintiffs allege that defendants hired four of the plaintiffs for summer employment and later denied all five plaintiffs such employment in retaliation for their preparations to bring this lawsuit. Plaintiffs further allege that the denial of summer employment was arbitrary. Defendants deny plaintiffs' allegations and answer that "it is school policy that if a teacher is not going to teach in the fall term that he or she not be employed for the preceding summer session."

75. On or about May 20, 1970, counsel for plaintiffs conferred with Superintendent Goolsby.

76. Plaintiff Baker testified that her principal, Mr. Thornton, offered her summer employment in the Title I program as an eighth grade English teacher, the position she occupied during the regular school year. She stated that she was employed for a day and then was told by the principal that she could not continue "because I had a lawsuit against the Board of Education and the Superintendent." Mr. Thornton took this step in response to a telephone call from the central office.

77. Plaintiff Dillard testified that Mr. Thornton offered him summer employment as a teacher of music and band. He stated that he worked for one day and then was told that he could not continue because of his lawsuit against the defendants. Mr. Thornton took this step in response to directions from Truitt.

78. Plaintiff Jones testified that he applied for and was accepted for participation in the summer recreation program, but on May 29, Mr. Truitt advised Mr. Jones' principal that Mr. Jones would not be able to work during the summer.

79. Plaintiff Williams testified that on May 29, 1970, he applied to his principal, Marshall Wicks, for a job in the summer program. Mr. Wicks checked with Mr. Truitt and advised Mr. Williams in tentative terms that there would be a job for him. Williams was not employed in the summer program.

80. Plaintiff Yates testified that she applied to her principal, Marshall Wicks, for summer employment and was given a letter of acceptance, but on May 29, 1970, the principal advised her and Mr. Williams that they would not be employed in the summer program because of their suit against the Board.

81. Principal Thornton testified that he recommended Mrs. Baker and Mr. Dillard for reemployment during the regular year and that he originally considered Mrs. Baker and Mr. Dillard for summer jobs, but that he was told by Mr. Truitt that they could not be hired because, in Thornton's words, they were teachers who "were involved by the NTE score". Mr. Thornton confirmed that Mrs. Baker was given a class on the first day of summer school.

82. Principal Wicks confirmed that he had given Mrs. Yates a letter employing her for summer school and that Mr. Williams had applied to him as well. He stated that later he advised both plaintiffs that they would not be hired for summer school because they were not under contract for the following school year. He further testified that to the best of his knowledge he did not mention the NTE score as a reason for refusing to employ these two plaintiffs in the summer program.

83. The coordinator of the summer program, Mr. Truitt, was uncertain in many of his answers to material questions, and frequently revealed that his answers were not based on his own knowledge.

84. On examination by the Court, Mr. Truitt testified that first preference for summer employment was given to applicants who either were under contract for the 1970–71 school year or who had already made a score of 1000 on the NTE, and that the plaintiffs' inability to satsify these standards was the "sole reason" why they had not been employed in the summer program.

85. Mr. Truitt testified that about 14 or 16 teachers were employed for summer school who did not meet either of these standards.

86. At the time plaintiffs were denied jobs in the summer program, the Title I Coordinator was making a last ditch effort to fill vacancies in the program.

87. Mr. Truitt stated that the positions for which the plaintiffs applied were sought by other applicants who were under contract or had attained 1,000 on the NTE. On cross-examination he acknowledged that plaintiff Baker's summer position as an eighth grade teacher at Hunt High School was filled by Carrie Nelson who neither was under contract for 1970–71 or had filed a satisfactory NTE score. Previously, Mr. Truitt had testified that Mrs. Baker's position was filled by Mrs. Bridges.

88. Mr. Truitt also acknowledged that plaintiff Jesse Jones' summer position as recreation director was given to his brother, Henry Jones, who already had another summer job. Mr. Truitt stated that it "would have been better for [Henry Jones] to concentrate on just one" job. Eventually, Henry Jones' second job was taken over by another person who was not employed in the school system in 1969–70 nor in 1970–71 nor had filed a satisfactory NTE score.

89. The circumstances surrounding the revocation of summer employment for four of the plaintiffs and the denial of such employment to the fifth plaintiff demonstrate that defendants did not apply the same standards to these plain-

tiffs as they did to other teachers who were hired for the summer program. Defendants have not explained why they applied different standards in determining not to employ the five plaintiffs for the 1970 summer program.

90. The defendants denied plaintiffs summer employment in retaliation for plaintiffs' efforts to commence the suit at bar.

## CONCLUSIONS OF LAW

1. This cause of action arises under Section 1 of the Civil Rights Act of 1871, 17 Stat. 13, 42 U.S.C. § 1983, and this Court has jurisdiction pursuant to 28 U.S.C. § 1343.

2. Plaintiffs have standing to sue. Association of Data Processing Service Organizations Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970); Smith v. Board of Education of Morrilton School District No. 32, 365 F.2d 770 (8th Cir. 1966); Alston v. School Board of City of Norfolk, 112 F.2d 992 (4th Cir. 1940).

### A.

3. It is unconstitutional for public officials to discriminate on the basis of race in the hiring and retention of teachers in the public schools. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5th Cir. 1969) (en banc); Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4th Cir. 1966) (en banc).

4. In cases where discrimination is in issue, "statistics often tell much, and Courts listen." Alabama v. United States, 304 F.2d 583, 586 (5th Cir.), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed. 2d 112 (1962). Accord, Turner v. Fouche, 396 U.S. 346, 360, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); United States v. Board of Education of City of Bessemer, 396 F.2d 44, 46 (5th Cir. 1968); Hall v. St. Helena Parish School Board, 417 F.

2d 801, 809 (5th Cir.), cert. denied, 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969); Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir., decided January 28, 1971).

5. In the case at bar there has been a long history of racial discrimination by defendants in the conduct of the Columbus Municipal Separate School District. The School Board continued to operate a dual system of schools based upon race long after Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and failed to commence conversion to a unitary system until required to do so by the order of this Court in August 1970. United States v. Columbus Municipal Separate School District, Civ.No. EC 70–55–S. In converting from a dual to a unitary system, defendants denied reemployment to a disproportionately large number of black first-year teachers (17 out of 18) as compared to the number of first-year white teachers (8 out of 73). A "long history of racial discrimination, coupled with disproportionate discharges in the ranks of Negro teachers where desegregation finally is begun, gives rise to a rather strong inference of discrimination. * * *" Williams v. Kimbrough, 295 F.Supp. 578, 585 (W.D.La. 1969). See Bonner v. Texas City Independent School Dist., 305 F.Supp. 600, 621 (S.D.Texas 1969); Chambers v. Hendersonville City Bd. of Educ., 364 F.2d 189, 192 (4th Cir. 1966) (en banc); North Carolina Teachers Ass'n v. Asheboro City Board of Ed., 393 F.2d 736, 743 (4th Cir. 1968) (en banc); Jackson v. Wheatley School District No. 28, 430 F.2d 1359, 1363 (8th Cir. 1970); cf. United States v. Jefferson County Board of Education, 372 F.2d 836, 887–888 (5th Cir. 1966), aff'd en banc, 380 F.2d 385 (1967), cert. denied, Caddo Parish School Board v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

6. The inference that defendants acted with a racially discriminatory

purpose in setting the requirement for a 1000 score on the NTE is concretely reinforced in this case by other facts. First, defendants knew from the experience with the PEP program that a 1000 cutoff score would eliminate proportionately a much higher percentage of black than white teachers and applicants. Second, defendants applied the NTE score requirement in an uneven fashion. Two black teachers who were employed prior to the 1969–70 school year and therefore were not subject to the NTE requirement were refused reemployment because they allegedly failed to qualify with a score of 1000. One white teacher in his first year was retained even though he did not attain a score of 1000. Third, defendants hired 44 new teachers, only one of whom was black. On the day before school opened, defendants have not offered jobs to nine black applicants who had attained and submitted NTE scores of 1000 or more even though there were 36 vacancies in defendants' system.

■ 7. The inference of racial discrimination arising from the circumstances of this case "thrust[s] upon the School Board the burden of justifying its conduct by clear and convincing evidence." Chambers v. Hendersonville City Bd. of Educ., *supra*, 364 F.2d at 192; Smith v. Concordia Parish School Board, Civ. No. 11,577, (W.D.La. Sept. 3, 1970), p. 9, appeal pending No. 30,-556; Rolfe v. County Board of Education of Lincoln County Tenn., 391 F.2d 77, 80 (6th Cir. 1968).

8. Defendants have not shown by "clear and convincing evidence" that their failure to rehire black first-year teachers and to hire black applicants was not racially discriminatory. Williams v. Kimbrough, *supra*.

9. The Court concludes that defendants in formulating and applying the NTE cutoff score requirement have purposely discriminated against black teachers and black applicants on account of their race.

B.

■ 10. The 1000 NTE cutoff score established by defendants creates a racial classification. Under this standard, 90 per cent of the white graduates from Mississippi institutions of higher education are eligible to teach in the Columbus school district and 89 per cent of the black graduates from Mississippi institutions are disqualified. This amounts to racial classification. Arrington v. Mass. Bay Transportation Auth., 306 F. Supp. 1355, 1358 (D.Mass.1969). See also, *e. g.*, Smith v. Texas, 311 U.S. 128, 131, 61 S.Ct. 164, 85 L.Ed. 84 (1940).

■ 11. Because the NTE, as used, classified applicants and in-service teachers on the basis of race, the defendants must show an "overriding purpose independent of invidious racial discrimination which justifies this classification." Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). See also McLaughlin v. State of Florida, 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

12. This analysis has been applied to public agencies using standardized tests to select public employees. In Western Addition Community Organization v. Alioto, 330 F.Supp. 536 (N.D.Cal. Jan. 8, 1971), the district court declared:

"Where the hiring practice of a public agency (even though it does not intend to discriminate against minority groups) has the *effect* of producing a de facto pattern of racial discrimination, such a discriminatory effect, although it does not necessarily render the method of selection constitutionally defective, does render the method of selection sufficiently suspect to make a prima facie case of unconstitutionality.

Under such circumstances the burden shifts to the public agency to justify the use of such generalized hiring tests by showing some rational connection between the qualities test-

ed by the written examination and the actual requirements of the job to be performed."

To the same effect, see Arrington v. Massachusetts Bay Transportation Authority, 306 F.Supp. 1355, 1358 (D. Mass.1969); Penn v. Stumpf, 308 F. Supp. 1238, 1242–1243 (N.D.Cal.1970).

13. In the case at bar, defendants have not discharged their "very heavy burden of justification" in this regard, Loving v. Virginia, 388 U.S. at 9, 87 S.Ct. 1817, and the Court, therefore, concludes that the NTE cutoff score requirement is an unconstitutional racial classification.

## C.

14. The constitutional principles set forth in ¶¶ 10–13 are paralleled by recent holdings of the Supreme Court and other courts with respect to the use of standardized tests permissible under Title VII of the Civil Rights Act of 1964. Section 703 of the Act renders unlawful employment practices that "would deprive or tend to deprive any individual of employment opportunities * * * because of such individual's race * * *." 42 U.S.C. § 2000e–2(a) (2).

15. Because defendants are a public agency and its officers, their actions are governed not by Section 703 of the Civil Rights Act of 1964, but by the Fourteenth Amendment to the Constitution. The Fourteenth Amendment imposes upon defendants prohibitions against race discrimination that are at least as great as those levied upon private employers in Section 703.

16. The Supreme Court held that in Section 703 Congress required "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." Griggs v. Duke Power Company, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158

(March 8, 1971). The Act proscribes not only "overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity." Id.

17. In Griggs the Supreme Court expressly rejected "subjective intent" as an element of racial discrimination, saying "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Id. "Congress directed the thrust of the Act to the consequences of the employment practices * * *." The burden is on the employer of "showing that any given requirement must have a manifest relationship to the employment in question." Id.

18. In the case at bar, defendants have failed to show a "manifest relationship" between the cutoff score used and job performance.

19. Although plaintiffs do not have the burden of proving that there is no "manifest relationship," the proof demonstrates as much. The NTE does not predict classroom effectiveness and does not even test for the great majority of factors that defendants believe are important in good teaching. The relationship between the test and teaching effectiveness is even more attenuated because defendants have used a cutoff score of 1000. There is no convincing evidence in the record showing any relationship between 1,000 on the NTE and effective classroom teaching, and results worked by the use of the cutoff score indicate that no relationship can be established. The Superintendent admitted that the NTE would bar some good teachers and all the plaintiffs at bar were recommended for reelection by their principals, who made their evaluations on the basis of classroom performance. One of these plaintiffs ranked first on the faculty at his school.

20. The Court concludes that under the rationale of *Griggs*, defendants' use of the 1000 cutoff score for hiring and reemployment is racially discriminatory. Equal Employment Opportunity Commission (EEOC), Guidelines on Employment Testing Procedures, CCH Employment Practices Guide ¶ 16,904 (August 24, 1966). *Accord,* Hicks v. Crown Zellerbach Corporation, 319 F.Supp. 314, 317–320 (E.D.La.1970); United States by Clark v. H. K. Porter Co., 296 F. Supp. 40, 78 (N.D.Ala.1968); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123, 136 (8th Cir. 1969); see also EEOC Guidelines on Employment Selection Procedure, 35 Fed.Reg. 1233, 29 C.F.R. 1607 (Aug. 1, 1970); and regulations adopted in 33 Fed.Reg. 14392 by the Secretary of Labor, acting under Executive Order No. 11246.

### D.

21. It is unlawful for public officials to exclude a person from practicing his profession in a manner or for reasons that contravene the Due Process or Equal Protection Clauses of the Fourteenth Amendment. In this connection, the Supreme Court has ruled that "any qualification must have a rational connection with the applicant's fitness or capacity" to perform his occupation or profession. Schware v. Board of Examiners, 353 U.S. 232, 239, 77 S. Ct. 752, 756, 1 L.Ed.2d 796 (1957). See also, Slochower v. Board of Higher Education, 350 U.S. 551, 559, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Dent v. West Virginia, 129 U.S. 114, 124, 9 S.Ct. 231, 32 L.Ed. 623 (1889). The Court concludes that, apart from its discriminatory aspects, the NTE cutoff score requirement is an arbitrary and unreasonable qualification for reemployment and employment as a teacher in the Columbus system and therefore violates the Due Process Clause.

### E.

22. During the transition from a dual to a unitary system, a school board has an obligation to maintain the "system-wide racial ratio" of its faculty. Carter v. West Feliciana Parish School Board, 432 F.2d 875 (5th Cir. 1970). Compare, Smith v. Concordia Parish School Board, Civ. Action No. 11,577 (W.D.La. September 3, 1970), appeal pending No. 30,556. Defendants have violated this requirement both by implementing the cutoff score requirement and by overtly discriminating against black applicants who met the requirement.

23. The hiring "of a disproportionate number of white persons, given the availability of apparently qualified black applicants, is improper and contrary to law." Lee et al. v. Chilton County Bd. of Educ., Civ. Action No. 3100–N (M.D.Ala. September 9, 1970).

24. The *Singleton* decree prohibits school boards in the process of transition from a dual system to a unitary system from reducing the number of teachers in the system and then filling those or other vacancies with persons of a different race unless the board first offers the vacancies to the displaced staff members. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5 Cir. 1969) (en banc). Defendants have violated this prohibition by failing to offer vacancies to black applicants or to those black teachers who have been displaced.

### F.

25. There is direct evidence that defendants denied summer employment to the plaintiffs in Count Two as a penalty for preparing to bring suit against the defendants. This evidence is reinforced by the absence of factual support for the defendants' ostensible reasons for denying plaintiffs summer employment. Defendants have maintained that they denied plaintiffs summer employment because plaintiffs did not meet the cutoff score on the NTE and alternatively did hold a contract for the 1970–71 school year. At least two

of the plaintiffs were offered summer employment and then replaced by other teachers who did not meet the cutoff score or hold contracts for the 1970–71 school year. In all, defendants hired 14 or 16 teachers who did not meet those requirements. In valuating defendants' actions, the Court is guided by the Fifth Circuit's recent decision in Fluker v. Alabama State Board of Education, 441 F.2d 201 (decided March 31, 1971), p. 209:

"When the violation of substantive constitutional rights has been charged, however, to the extent that the absence of factual support for the stated reasons for the University's action tends to prove that some other constitutionally impermissible reason underlies the action, the courts should examine the credibility of the University's stated reasons. Johnson v. Branch [4 Cir., 364 F.2d 177], *supra.* Thus, in the instant case, if the appellants could demonstrate that there was no factual basis for the University's action, this would tend to prove that other, constitutionally impermissible reasons motivated the University's action."

26. Plaintiffs in Count Two of the complaint were denied summer employment as a penalty for bringing this suit and are entitled to damages. Johnson v. Branch, 364 F.2d 177, 182 (4th Cir. 1966) (en banc). See Porcelli v. Titus, 302 F.Supp. 726, 736 (D.N.J.1969).

27. Alternatively, the Court concludes that the standards for summer employment were not applied to plaintiffs in an even handed and rational fashion, as required by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *E. g.,* Yick Wo v. Hopkins, 118 U.S. 356, 374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). Accordingly, plaintiffs in Count Two are entitled to damages. Johnson v. Branch, *supra.*

An appropriate order will be entered to give effect to the holding of the court in this opinion.