UNITED STATES of America,
Plaintiff,

v.

NANSEMOND COUNTY SCHOOL BOARD et al., Defendants.

Syvalius WALSTON, Jr., et al., Plaintiffs,

v.

COUNTY SCHOOL BOARD OF NANSEMOND COUNTY, Virginia, et al., Defendants.

Civ. A. Nos. 392–70–N and 472–71–N.

United States District Court, E. D. Virginia, Norfolk Division.

Nov. 28, 1972.

Brian P. Gettings, U. S. Atty., Norfolk, Va., for United States.

James A. Overton, Portsmouth, Va., S. W. Tucker and Henry L. Marsh, III, Richmond, Va., for Walston, and others.

Joshua Pretlow, Suffolk, Va., and Frederick T. Gray, Chesterfield, Va., for Nansemond County School Board.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

The findings and conclusions herein pertain to both Civil Action No. 392–70–N and Civil Action No. 472–71–N, which were consolidated on December 8, 1971, for discovery and trial. The United States is seeking supplemental relief in its original school desegregation suit against the Nansemond County School Board, which was initiated pursuant to the provisions of 42 U.S.C. § 2000c–6, and 28 U.S.C. § 1345. The government asks the court to order the defendant school board to demonstrate that its hiring, firing, demotion, promotion, dismissal, and payment of its staff and faculty have been accomplished through reasonable objective standards. Additionally, the school operation plan for the 1971–72 school year was opposed, but that plan was approved on October 18, 1971, as effectively creating a unitary system in strict compliance with the law. The individual plaintiffs herein seek to invalidate the objective criteria used by the school board as being irrelevant and not uniformly applied, and thereby in violation of the due process and equal pro-

tection clauses of the Fourteenth Amendment. Their action is brought pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 1981, 1983.

This case is interesting and deserves close attention in that it clearly defines the paradox which is currently facing the school boards and the district courts throughout our nation. On the one hand, the school board is admonished for using subjective standards in evaluating its teachers and is told that only objective standards are acceptable. Conversely, once the school board adopts a criteria which could hardly be more objective, protests are lodged because employment decisions are made without reference to some purely subjective standards. If we were required to invalidate both guidelines, the school board would find itself forced to adopt a quota system, disregarding the qualifications of the teachers involved. Such a result is the antithesis of the philosophy underlying much civil rights litigation.

Early in 1968, Robert A. Wood became the new Superintendent of the Nansemond County School System and, from the outset, he began to evaluate the system looking for the areas in which improvement was needed. As a part of this undertaking, an independent biracial evaluation committee of educational experts was appointed to survey the entire system and make a report of its findings. The committee submitted its findings (the Stahl report) in the spring of 1969 and, among other comments, reported that, while the teachers apparently knew their subject matter, they either lacked the ability to communicate and/or were drastically outdated in their teaching techniques.

The sense of urgency conveyed by the Stahl report reinforced Wood's concern over the faculty. Indeed, since taking over as school superintendent, he had initiated a uniform system-wide teacher evaluation form in an effort to have some common understanding by the principals as to what a particular rating connoted. However, such a form re-quires years to be adequately developed and a principal needs more than one years' experience as an evaluator to become completely reliable. There was evidence from the plaintiff's expert that the new criteria were, in fact, vague. Also, Nansemond County's supervisory staff was overworked to such an extent that they could not bear the necessary burden of close effective supervision.

For these reasons, other objective criteria were sought and eventually a test score of 500 on the Weighted Commons section of the National Teachers Exam (NTE) was adopted as a minimum requirement. This decision was not hastily made, as it was not approved until January 13, 1970. Before adopting the NTE requirement, other school systems which used the same test were contacted. They included the surrounding systems of Norfolk, Portsmouth, Virginia Beach, Chesapeake and Newport News, plus North Carolina which has a similar policy with regard to state-wide certification. There were some observations by school officials that many of the teachers whose work was unsatisfactory came from North Carolina, having failed to earn a teaching certificate in that state. A majority of these teachers were white. The Educational Testing Service (ETS) of Princeton, New Jersey, the originator of the NTE, was requested to send all information it had concerning the test. The decision to use the test was also made in light of additional studies reported in psychology journals, the fact that some of the area's colleges had open admission requirements, and also that there was no longer a dearth of qualified applicants but rather a surplus from which to choose.

From the information supplied to him by ETS, which was substantiated by the plaintiff's expert witness, James R. Deneen, Wood obtained evidence as to the nature and scope of the NTE. It is a test given several times each year by the ETS which is solely responsible for administering and grading the test and reporting the results. It has two sections; the Weighted Commons and the Teach-

ing Area Examination. The latter is a test of an individual's command of a specific subject such as math, history, French, etc. The Weighted Commons section offers a general appraisal of a prospective teacher's basic professional preparation and general academic attainment. Since it is standardized nationally, it offers an opportunity for school boards to better interpret transcripts from colleges of varying qualities. The NTE is designed to test important aspects of professional studies—psychological foundations of education, societal foundations of education, teaching principles and practices—and it is updated every year to test the most current teaching philosophies and techniques.

While ETS does not recommend using NTE scores as a sole criteria, it readily admits that most school districts establish a local minimum, which must be met initially or within a specified period of time. Nansemond County adopted as a minimum requirement the submission of a score of 500 on the NTE, which would rank the applicant somewhere within the bottom 10 to 15 percentile. The school board did not require all the teachers in the system to take the NTE, but only teachers who were new to the county in 1970–71 and all subsequent applicants. Some teachers took the NTE more than once during the year in question. Those hired for 1970–71 were informed that the renewal of their contracts was conditioned on their receiving a score of at least 500 on the Weighted Commons. This provision was clearly set out in the teachers' contracts at the time of signing.

After adopting the NTE requirement, Nansemond County employed Dr. Roger L. Long to undertake a study of the test scores and the proper use thereof. Dr. Long has a Doctor of Education degree with heavy emphasis on testing and a

high degree of familiarity with the NTE itself. It is because the school board implemented its decision before Dr. Long completed his empirical study that the plaintiffs object. During 1970–71 some teachers' contracts were not renewed because they failed to submit a score of 500 on the NTE.[1] There were also some individuals who were refused consideration for employment for 1971–72 because they received a sub-500 score. The test scoring, of course, was not under the control of the school board or its administration.

In Nansemond County for the school year 1969–70 the faculty was 59% black, and by 1971 the percentage black had dropped to 52%. One hundred three teachers left the school system in June 1971. Of these, only 25 were not offered new contracts. There were 510 applicants for positions for 1971–72; 391 white and 119 black. Only 20 of 119 blacks were denied consideration solely for failing to score 500. As for the remainder, most were refused positions for the reason that no vacancy existed for the position sought. Additionally, many failed to meet one or more of the other minimum standards—a completed application, a successful interview, and favorable references.[2]

A question has been raised concerning the United States' standing to seek supplemental relief for alleged abridgments of the employment rights of black teachers. Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, is not limited to relief in terms of placement of black students and teachers, but allows the Attorney General to seek "such relief as may be appropriate." The courts have recognized that racially free teacher employment practices are essential to an effective unitary school system. See Singleton v. Jackson Municipal Separate School Dist., 419 F.2d 1211 (5 Cir.,

---

1. There was one individual who was initially refused a contract but subsequently was rehired when a satisfactory score was achieved.

2. There was some evidence to the effect that many of those who were told that the NTE was the only reason for dismissal had additional reasons for not being retained. The reasons included teaching out of the area of certification, poor quality of teaching, numerous garnishments, and special discipline problems.

1969). The United States apparently has standing to question the employment practices with respect to teachers, but this still leaves open the question of whether the government may properly ask for reinstatement, back wages and/or damages to remedy any individual discrimination. This question has been obviated for the most part by the fact that most individual plaintiffs are presently represented by counsel and have brought their own actions.

[1, 2] Throughout the evidence in this case there have been references to the failure of the school board to fully advise the plaintiffs of the reasons for their nonretention and to the absence of any hearing on the matter. A recent Supreme Court decision seems to forestall any objection solely on these grounds. See Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Procedural due process requirements are inapplicable to teachers without tenure or some implied promise of continued employment. A showing of sufficient cause is not a prerequisite for dismissal since the teacher has no property interest in the job itself. In Virginia there were no tenured teachers at the time of the suit because the tenure statute had been in effect only two years and it provided for a three-year probationary period for all personnel. Virginia Code Ann. §§ 22–217.1 to 22–217.8 (1969). On the other hand, a district court is not justified in summarily dismissing all complaints of nontenured teachers. If there is a charge that some substantive due process right has been violated, a full exploration of the constitutional issue is required. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). See also Chitwood v. Feaster, 468 F.2d 359 (4 Cir., 1972).

While the procedural claims of the plaintiffs may be disregarded, summary judgment in this case is improper because a *bona fide* constitutional issue has been raised. The Nansemond County School Board has been charged with having utilized employment practices which were, in effect, racially discriminatory. There is no charge, and indeed no evidence, to support a finding that Nansemond County intentionally discriminated against black teachers. This Court finds as a fact that there was no racial motivation involved in any decision of the school board,[3] other than the avowed purpose of keeping the black to white ratio constant. However, this lack of intentional discrimination is not dispositive of the case since there are certain situations in which *de facto* discrimination may violate individual rights. Two such situations are presented by the facts alleged. The adoption of the NTE requirement resulted in the failure to renew the contracts of more blacks than whites. Also, in the recently desegregated school system a larger number of black teachers were demoted or refused reemployment based upon the subjective evaluation form and recommendation of the principal. The question before this court is whether the employment standards utilized by Nansemond County are justifiable under the circumstances in light of the equal protection clause of the Fourteenth Amendment.

Since the NTE has been adopted as a condition of employment, the plaintiffs argue that the recent Supreme Court decision of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) is controlling. While *Griggs* was a matter of construing a statute not presently before this

3. The law seems to be that if there is a substantial discriminatory effect and the school board cannot explain the necessity of their actions, then the court is justified in inferring an intentional discriminatory motive. See Baker v. Columbus Separate School District, 329 F.Supp. 706 (N.D.Miss., 1971), affirmed 462 F.2d 1112 (5 Cir., 1972). Any inference is overcome in this case by valid reasons for their actions. Therefore, the total absence of evidence of intentional discrimination is fatal to such a finding.

court,[4] its rationale is no stranger to the mandates of the Fourteenth Amendment. The general principle is that a state may accord different treatment to persons placed by it into different classes; see McDonald v. Board of Election, 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); Railway Express v. New York, 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949); but at the same time such classification of persons must not be made upon purely arbitrary criteria. The cases indicate that arbitrariness is measured by the degree of correlation between the standard employed and the valid objective intended. Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). If there is a reasonable relationship to a valid state interest, the criteria utilized will be allowed to stand. Cf. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

■ When dealing with tests as a condition of employment, this "reasonable relationship" has been translated to mean a "reasonably necessary connection between the qualities tested * * * and the actual requirements of the job to be performed." Western Addition Community Organization v. Alioto, 330 F.Supp. 536, 539 (N.D.Cal., 1971).[5] See also Arrington v. Massachusetts Bay Transportation Auth., 306 F.Supp. 1355 (D.Mass., 1969); Penn v. Stumpf, 308 F.Supp. 1238 (N.D.Cal., 1970). It would seem to make no difference whether the classification being attacked is merely on the basis of those eligible to work and those not eligible; Armstead v. Starkville Municipal Separate School Dist., 461 F.2d 276 (5 Cir., 1972); or on the basis of race; Arrington, su-

pra. The inquiry is the same[6] since there is nothing which dictates that an employer must refuse to hire the most qualified individuals seeking employment simply because of race. The test need only reasonably measure those abilities which are essential to the job to be performed.

■ The application of this "reasonable measure" criteria is complicated by the fact that tests may be validated in several ways. A test may have content validity—that is to say, the knowledge and abilities tested are those utilized in the job contemplated. There is also the possibility that predictive validity might exist—in other words, there is a correlation between a score and ultimate effectiveness on the job. In deciding which of these standards is to be employed, much attention must be placed upon the word "reasonable." In some cases if content validity exists, automatically there will tend to be predictive validity —these would be instances of manual labor. In other circumstances, little or no predictive validity would be indicated by content validation. Also, in some cases, predictiveness of job performance is relatively simple to establish, while for other tasks it is nearly impossible to establish. For these reasons the determination of reasonable measure must be undertaken on a case-by-case basis, if in actuality predictiveness is ever required. See Castro v. Beecher, 334 F.Supp. 930, 945 (D.Mass., 1971).[7] For the determination in this case, attention will be given to the teaching profession in general and to Nansemond County in particular.

The evidence clearly establishes that no study has shown any correlation between any score and an ultimately effective in-service teacher; that is, teacher

---

4. While it has no effect on this action, it should be noted that 42 U.S.C. 2000 e(b) has been amended to include public employers within its provisions. See Pub.Law 92–261, 1972 U.S.Code Cong. and Admin.News, pp. 814–826.

5. This case was revised as to other matters at 340 F.Supp. 1351 (1972).

6. It has been held that in racial classification cases the burden of proof which must be met is heavier, but the standard is still the same. See Castro v. Beecher, 459 F.2d 725, 732 (1 Cir., 1972).

7. The holding in this case was modified on appeal, but the guidelines set out by the lower court were upheld. 459 F. 2d 725 (1 Cir., 1972).

ability to increase learning capacity of students. Thus the NTE lacks predictive validity. However, the evidence also reveals that *no* test currently measures this relationship; nor is it likely that any test could be developed to accomplish this goal. There were two major reasons given for this failure. First, there is no general agreement as to what constitutes an "effective teacher" and there is no way to detect one teacher's effect on a class of students, for the variables are too vast. Additionally, there are too many subjective qualities such as motivation, ability to command respect, ability to interact with fellow teachers and the administration, etc., which are not readily capable of measurement and which are essential in an "effective teacher." It seems ridiculous to say that before a test is a reasonable measure it must also do the impossible.

It is argued that Nansemond County should have undertaken an empirical study to develop its own predictive validation by testing all new applicants, and subsequently judging their effectiveness in light of the county's individual needs. As ideal as this procedure may be to ensure the proper use of the NTE, if it is unreasonable, it need not be required. Such a study would involve a lengthy period of hiring individuals with both high and low scores. In light of the findings of the Stahl report, such a requirement could have an adverse effect on the children's education. It must be remembered that Nansemond County began an evaluation of the NTE concurrently with its adoption as an employment criteria when Dr. Long was hired. The only thing Nansemond County did was to refuse to chance hiring someone who was in the lowest 10–15% nationally. This did not affect the validity of the

study since the experts testified that the spread from 500 to 900 was sufficient for compilation of valid statistical data. At trial Dr. Rosner, a plaintiff's expert, agreed that if a school system had to choose between gambling that a teacher with a sub-500 score would be effective and protecting the education of the student, the "rights" of the teacher should not be protected for the purpose of sacrificing the children.

■ The plaintiffs cite cases which, they feel, compel the use of predictive validity as the yardstick by which the use of the NTE should be judged. Although it is unnecessary to determine whether *Griggs, supra,* and its companion federal regulations, 29 C.F.R., § 1607.1 et seq., require predictive validity, content validity is appropriate when empirical data is not feasible and especially with well-developed tests.[8] One case cited expressly reserves ruling on this issue as the test lacks both content and predictive validity. Chance v. Board of Examiners, 458 F.2d 1167, 1174 (2 Cir., 1972). See also Castro v. Beecher, *supra.* Another case dealt with the lack of content validity since the test was designed to test aptitude for graduate work; not for teaching. Armstead v. Starkville Municipal Separate School Dist., *supra.* The use of an NTE cutoff score was the subject of scrutiny in Baker v. Columbus Municipal Separate School Dist., 329 F.Supp. 706 (N.D. Miss., 1971). The school board's use of the score requirement was invalidated not only because of a failure to comply with the constitutional mandate of *Griggs,* but also because of a finding of intentional discrimination; 329 F.Supp. at 720. While *Baker* was affirmed on appeal, 462 F.2d 1112 (5 Cir., 1972), the only ground for the affirmation was the finding of purposeful discrimination,

---

8.  29 C.F.R. § 1607.5(a):

"* * * Evidence of content or construct validity, as defined in that publication, may also be appropriate where criterion-related validity is not feasible. * * * Evidence of content validity alone may be acceptable for well-devel-

oped tests that consist of suitable samples of the essential knowledge, skills or behaviors composing the job in question. The types of knowledge, skills or behavior contemplated here do not include those which can be acquired in a brief orientation to the job."

thus leaving open for conjecture the issue of pure job-relatedness.

Looking to the district court's application of *Griggs* in Baker v. Columbus Municipal Separate School Dist., we must take exception to the finding of no content validity. That court reasoned that since the examination tested only four out of twenty-five characteristics, there had been no showing of a "demonstrable relationship" between the test and teaching. 329 F.Supp. at 715, 721. This reliance merely on the number of factors tested is unwarranted. There may be a finding of "reasonable relationship with job performance" with only one characteristic being tested as long as that characteristic is substantially involved in the successful performance of the job.

For these reasons, the admitted lack of predictive validity of the NTE is not fatal to its use, and the inquiry must turn to its content validity. All of the evidence, including that from the plaintiff's own experts, would seem to indicate that the test validly measures skills essential to the teaching profession. When asked if the NTE were job-related, Dr. Benjamin Rosner, who has a doctorate in testing and was formerly responsible for development of the NTE, replied:

"If you think of the examination as assessing knowledges which persons who fill certain positions should theoretically possess, then the examination is job-related in a sense that the knowledges measured are relevant to the performances of the teachers * * *."

This statement is supported by Dr. James R. Deneen, who is currently with ETS. He feels that the NTE aids in determining who is qualified to teach in that it effectively tests the knowledge utilized by teachers. This relation with the job is rational, reasonable and substantial as the expert testimony was to the effect that knowledge makes up at least 25% to 30% of composite teaching behavior. Dr. Deneen summed up the

Court's feeling as to the job-relatedness of a test which measures knowledge when he said, "You can't do what you don't know."

Generally speaking, the NTE is a valid criterion to be used in employment decisions, but the question remains as to whether Nansemond County used it in a reasonable manner. The experts were in agreement that the degree of reliance which a particular school district might place upon any score varied with the needs of each district. After having read all the literature on the NTE and conferring with the experts at ETS, Nansemond County established a cutoff score in light of the information revealed by the Stahl report. The school system needed teachers with the basic ability to communicate and with some understanding of modern teaching techniques, thus only the Weighted Commons section was required. ETS had advised that the test lacked validity with experienced teachers, thus only first-year teachers and new applicants were required to take the test. ETS itself could not condone blanket use of a minimum cutoff score, but did admit that the cutoff score would be valid if there were more applicants than could possibly be interviewed. This is some indication that there is merit to score comparison, otherwise a minimum score could never be justified. It is also admitted that most of the systems which require the NTE have established some cutoff score.

Dr. Deneen's observations with respect to Nansemond County's use of the NTE deserve consideration. He commented that many school districts abused teacher rights with an indiscriminate use of the NTE, having made no effort to justify their actions. Nansemond County, on the other hand, has what he considers to be faults but with good explanations for the use they have made of the NTE. If an expert sees good reasons given for the use of a valid employment criteria, this Court will acquiesce in such a finding without clearly conflicting expert testimony to the contrary.

Plaintiffs complain that the NTE requirement, as instituted by the school board, resulted in the retention of teachers less qualified than those dismissed. This Court does not find that every teacher dismissed was less qualified in all respects than every teacher retained, but such a finding is unnecessary. As long as the requirement is reasonably related to the job to be performed and is uniformly applied in a nondiscriminatory manner, its use is valid. It is argued that the test is not a reasonable measure with respect to the in-service teachers affected since nearly all nonretained teachers had been rated "average" on their evaluation forms. This argument is based on tables compiled by government employees assigning arbitrary values to the different classifications of the teacher evaluation sheets. The statistical reliability of these charts was sufficiently impugned at trial and any reliance on them would be unwarranted. With even a cursory glance, it may be seen that "average" was merely a category designation and was not a relative term, since the true average teacher was in the "above average" category. The statistics cited as to teachers retained who lacked college degrees must be interpreted in light of the fact that many were teacher aides, and the others had many years of experience with Nansemond County and were not required to take the NTE. Even though some teachers were recommended for reemployment by their principals, their nonretention was not unjustified for two reasons. First, principal recommendation, while carrying great influence, is not the sole determinative factor. Secondly, there is some evidence to the effect that principals would recommend for reemployment knowing that nonretention was eminent in order not to jeopardize the teacher's chances in another school district.

Finally, we are urged to invalidate the NTE requirement because of its nonuniform application. Nansemond County did apply the test in a nonuniform manner in that only teachers who began teaching with Nansemond County for the 1970–71 school year were required to submit a score. Within that classification, however, there was uniformity. The reason for the distinction is apparent from the record. The ETS had said that the test was least valid when applied to experienced teachers; additionally, Nansemond County felt there would be too much disruption and upheaval if all teachers were put under the same restrictions. It is interesting to note that if the court were to accept the government's contention, having found the test to be reasonable, a uniform application as to all teachers would probably have a much greater impact on the percentage of black teachers.

The second constitutional issue which deserves discussion, see Perry v. Sindermann, *supra*, also involves the equal protection clause and Fourteenth Amendment even in the absence of any intentional discrimination. The courts have held that, in a recently desegregated school system, when the desegregation causes the reduction in the number of teachers, any dismissals or demotions must be upon objective criteria which are nonracial in nature or motivation. See United States v. Texas Education Agency, 459 F.2d 600 (5 Cir., 1972); Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5 Cir., 1970), cert. denied 396 U.S. 1032, 90 S. Ct. 612, 24 L.Ed.2d 530 (1970). The theory seems to be that a black teacher does not lose her job "teaching the Negro pupils" if the school is closed, but rather that all teachers are to be treated equally system-wide. North Carolina Teachers Ass'n v. Asheboro City Bd. of Ed., 393 F.2d 736, 743 (4 Cir., 1968).

This issue presents two classes of plaintiffs each warranting separate considerations. One plaintiff, Mrs. Beulah Watts, was the assistant principal at a school closed pursuant to the 1971–72 desegregation plan. Subsequent to the closing of her school, she was demoted to classroom teacher. The other plaintiffs were teachers whose contracts were not

renewed based, in part, upon the recommendation of their individual principals.

■ Mrs. Watts has a more substantial claim than do the remaining plaintiffs. She seems to come within the rule of *Singleton, supra,* in that her position was terminated by the unification process of the Nansemond County school system, and that her demotion was effectuated without any system-wide comparison of her objective qualification with others of similar duties. Defendant argues that since Mrs. Watts did not testify at trial, nor was her deposition entered into evidence, the dearth of evidence will not support a finding of discrimination. This argument must be rejected since the cases hold that the burden shifts to the defendant to justify its actions with regard to these matters.[9] There has been no attempt to comply with either the objective criteria standard of *Singleton, supra,* or the "absent good cause for refusal to rehire" standard imposed by *Asheboro City Board, supra,* at 744. For this reason, without deciding what effect *Singleton* may have on *Asheboro City Board,* Mrs. Watts is entitled to relief if the government has standing to seek relief in her behalf.

■ The remaining plaintiffs are in an entirely different situation. There is no allegation, much less any proof, that their jobs were eliminated because of the desegregation plan. Their schools were not closed, nor were they slated for reassignment. The plaintiffs attempt to justify their position by an expanded reading of *Singleton.* They argue that the system was recently desegregated and they were fired; therefore, the burden shifts to the defendant. This Court declines to extend *Singleton* to such limits. That case must be limited to the situation where a certain number of teachers must lose their jobs and all are apparently qualified. Here there has

been no showing of any connection between the desegregation and the dismissals to bring *Singleton* into effect. In fact, it has been held that mere disproportion between the number of black and white teachers does not, of itself, establish racially discriminatory hiring practices. Conley v. Lake Charles School Board, 434 F.2d 35, 37 (5 Cir., 1970). Because of the past history of discrimination and the point in time of the dismissals, the Court will undertake to examine the process by which the dismissals occurred to determine if any discrimination has been shown.

■ Many things are taken into account with respect to the decision of retaining a particular teacher. The recommendation based upon in-class observations of the principal, supervisor, and assistant superintendent for instruction are given great weight. The principal's evaluation form is used as a guide, but no set number of "bad marks" is necessary before a teacher is not recommended for employment by him. Other aspects are important such as personal opinions formed on day-to-day contact, general attitude of other personnel, amount of sick leave taken, and the manner and promptness in which required forms were completed. The evaluation form itself has little to do with reemployment, but is intended as a cooperative effort for the teacher's self-improvement. The important thing to remember is that where a principal recommends nonretention, he must justify his decision, whether it be upon the evaluation form or by other data.

All plaintiffs who were not reemployed for reasons other than failure to submit a 500 score on the NTE were not recommended by their principals. As to those individuals for whom evidence was entered, it is quite clear no pattern of discrimination was established. All of

---

9. It is interesting to note that one circuit recently held that, once there has been a good faith effort to comply with court-ordered desegregation, the burden shifts back to the plaintiffs with respect to

prayers for supplemental relief. See Mapp v. Board of Education, (6 Cir.), 41 U.S.L.W. 2207. Cf. Jennings v. Meridian Municipal Separate School Dist., 453 F.2d 413, 414 (5 Cir., 1971).

the evidence supports a finding that the principals, who were black themselves, had the requisite justifications for their recommendations. One teacher, who had been released from Nansemond County previously, admitted that he and his principal could not work together without one changing and that it was the principal who should change. Another teacher had been having grave discipline problems which was the subject of numerous conferences with his principal; yet another teacher had apparently become totally inadequate.

■ This Court finds that the process by which teacher contracts are renewed is not, of itself, discriminatory. To hold upon this record that the school board discriminated against the plaintiffs in utilizing these practices would unduly interfere with decisions which must be made. The school board members are charged with the crucial task of providing the best quality education possible for all children. This duty may be discharged only if teachers are employed by ability and no other criteria. Deal v. Cincinnati Board of Education, 419 F.2d 1387 (6 Cir., 1969). They are the experts and the district court should never lightly substitute its judgment for their considered opinion. Jennings v. Meridian Municipal Separate School Dist., 337 F.Supp. 567 (S.D.Miss.), aff'd 453 F.2d 413 (5 Cir., 1971). Unless there is sufficient evidence of discrimination, the fact that the teachers were dismissed because of subjective evaluations and without having their objective credentials compared with all teachers system-wide will be immaterial. As long as school officials do not apply constitutionally impermissible considerations, they should be free to improve their faculty whether or not desegregation is in process. Bonner v. Texas City Independent School Dist. of Texas, 305 F.Supp. 600 (S.D.Tex., 1969).

For the reasons enumerated above, all plaintiffs, with the exception of Mrs. Watts, are denied any and all relief. Without deciding the substantial ques-

tion in the Court's mind as to the standing of the United States to seek relief by way of damages and back pay, at this point Mrs. Watts is entitled to a further hearing to determine her damages, if any, by reason of her demotion from the position of assistant principal to classroom teacher. If the parties cannot agree as to same within thirty days from this date, a hearing will be directed, and the Court will then make a final determination as to the right of the United States to obtain relief in her behalf.