UNITED STATES of America, Plaintiff,

v.

SCHOOL BOARD OF the CITY OF SUFFOLK et al., Defendants.

Syvalius WALSTON, Jr., et al., Plaintiffs,

v.

SCHOOL BOARD OF the CITY OF SUFFOLK et al., Defendants.

Civ. A. Nos. 392–70–N, 472–71–N.

United States District Court, E. D. Virginia, Norfolk Division.

Aug. 20, 1976.

judgment of a court is given full effect." *Lamb v. Carey*, 162 U.S.App.D.C. 247, 498 F.2d 792–93 (1974).

Teresa T. Milton, Civil Rights Div., Ed.
Sec., Dept. of Justice, Washington, D. C.,

James W. Benton, Jr., Hill, Tucker & Marsh, Richmond, Va., for plaintiffs.

William W. Jones, City Atty., Suffolk, Va., Frederick T. Gray, Chesterfield C. H., Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, District Judge.

Following a reversal and remand of this Court's prior opinion, 351 F.Supp. 196 (1972), denying injunctive relief, reinstatement and back pay to certain black teachers formerly employed by the County School Board of Nansemond County, Virginia, the proceedings were somewhat delayed because, as of January 1, 1974, the County of Nansemond ceased to exist, it having been merged with the City of Suffolk effective on the stated date. The School Board of the City of Suffolk, as successor to the County School Board of Nansemond County, has been substituted as a party defendant in the consolidated actions, and has acknowledged its responsibility for the past acts of its predecessor.

In *Walston v. County School Board of Nansemond County,* 492 F.2d 919 (4 Cir. 1974), the issue involved the use of the National Teachers Examinations (NTE) to ascertain whether teachers, employed for the first time during the 1970–71 school year and pertinent to all subsequent applicants, should be given renewal contracts (or original contracts) for the 1971–72 school year and thereafter. In reversing the district court, the opinion states in part:

> For the reasons hereafter set out, we reverse the judgment and direct that the teachers terminated solely upon the basis of NTE scores be reinstated with full back pay; that the cases of the teachers terminated "for cause" be re-examined at a hearing to be held by the District Court at the earliest practicable date to consider the validity of such dismissals and the appropriateness of reinstatement; that appropriate injunctive relief be issued and that the damages, if appropriate, be awarded.

\* \* \* \* \* \*

We hold that the NTE, as applied here, was discriminatory and that the teachers terminated because of their failure to make a 500 score on the test must be reinstated with back pay and their damages, if any, settled. The facts surrounding the dismissal of certain teachers "for cause" must be re-examined by the District Court with a view to making certain that their dismissal was not linked to discriminatory action with the burden of proof on the School Board; and if it was, then appropriate relief should be afforded them. Injunctive relief must be granted in such terms as will insure that further discrimination in the employment and retention of teachers in the School District will not recur. Finally, the District Court, in the exercise of its sound discretion, may grant such other and further relief as it deems necessary and appropriate.

■ At the outset it is contended by the United States that the "law of the case" applies and wherever the teacher was not notified that he or she would not be considered for reemployment because of failure to achieve a score of 500 on the NTE, the defendants are estopped from showing that the real cause for nonreemployment was otherwise. At the first trial of these actions, no effort was made to go beyond the failure to achieve the required score although, in several instances, the defendants stated there were other reasons for not renewing the contract. We decline to apply the doctrines of the "law of the case" and "estoppel" to the facts presented, especially in light of the language of Mr. Justice Clark's opinion which, in one place, uses the words *"solely* upon the basis of NTE scores." To hold otherwise would be to afford relief to one teacher who failed to make the required score but whose principal said that he knew the teacher had not achieved the score and he did not want to reflect upon the teacher's record by stating the details of incompetency.

Counsel for Walston, et al, have requested an allowance of attorney's fees, costs

and expenses. This issue will be discussed *infra*.

## INJUNCTIVE RELIEF

While awaiting the transcripts and briefs, the Court was requested to enter an injunctive order. In substance, the injunction prohibited the defendants, their officers, agents, employees and all others in active concert or participation from—

(D)iscriminating on the basis of race or color in the employment of teachers and other personnel in the City of Suffolk School System. The defendants are further enjoined from making use of the National Teachers Examination as a sole basis for employment, re-employment or termination of services of any teacher of other personnel in the school system.

Plaintiffs argue that the language of the order is insufficient in that the Court should require that, before the use of NTE or any written examination, constitutionally required validation studies must be completed.

■ It is conceded that, upon receipt of the opinion by the Court of Appeals, the requirement of a score of 500 in the NTE Weighted Common was abolished. Indeed, no NTE is now required. To broaden the language of the injunctive order would negate the opinion where it states that NTE could be considered as a factor (but not solely) in determining whether a teacher should be employed, retained, or services terminated.

## ALLEGED JURISDICTION OF ACTIONS

During the course of original proceedings and on remand the Court raised the jurisdictional question of whether the Attorney General has authority under 42 U.S.C. § 2000c–6 to make a supplemental motion for relief on behalf of individual schoolteachers dismissed for allegedly racially discriminatory reasons. That is, although the United States properly instituted suit on behalf of schoolchildren to desegregate the Nansemond County schools, is the United States the proper party plaintiff to act on behalf of the schoolteachers in a separate request for relief in the form of reinstatement and back pay? The Court suggested at the outset that, to avoid this problem, the teachers might want to obtain private counsel and subsequently all but a few did so. Faced now with this question, and for the reasons explained below, we think the United States does not have such authority.

The statute, 42 U.S.C. § 2000c–6, reads in part as follows:

(a) Whenever the Attorney General receives a complaint in writing—

(1) signed by a parent or group of parents to the effect that his or their minor children, as members of a class of persons similarly situated, are being deprived by a school board of the equal protection of the laws, or

(2) signed by an individual, or his parent, to the effect that he has been denied admission to or not permitted to continue in attendance at a public college by reason of race, color, religion, sex or national origin,

and the Attorney General believes the complaint is meritorious and certifies that the signer or signers of such complaint are unable, in his judgment, to initiate and maintain appropriate legal proceedings for relief and that the institution of an action will materially further the orderly achievement of desegregation in public education, the Attorney General is authorized, after giving notice of such complaint to the appropriate school board or college authority and after certifying that he is satisfied that such board or authority has had a reasonable time to adjust the conditions alleged in such complaint, to institute for or in the name of the United States a civil action in any appropriate district court of the United States against such parties and for such relief as may be appropriate . . . . .

■ Clearly the statute was intended for the benefit of schoolchildren (or individuals in college) who were adversely affected by discrimination. The legislative history of § 2000c–6 amply supports this conclusion.

A House report of December 2, 1963, from the Committee on the Judiciary, states:

> The committee . . . has adopted a provision authorizing the Attorney General, upon receipt of a signed complaint, to institute legal action *in behalf of schoolchildren* or to intervene in a legal action already commenced *in behalf of schoolchildren* in order to desegregate public schools and colleges. This proposal has received bipartisan support for many years. (Emphasis added.)
>
> H.R.Rep. No. 914, Part 2, 88th Cong., 1st Sess. (1963), p. 22.

Senator Hubert Humphrey, who was floor manager of the bill which later became the Civil Rights Act of 1964, explained in the course of debate the purpose of Title IV (The Public Education Subchapter which includes § 2000c–6):

> Children who were entering segregated primary schools when the Supreme Court decided the Brown case are now attending segregated high schools. We can never make up the loss to their education; but the Federal Government can help to see to it that children who will enter segregated kindergarten next fall will not be graduating from a segregated high school in 1978.
>
> Bernard Schwartz, *Statutory History of the United States, Civil Rights,* p. 1205.[1]

That the resources of the Attorney General's office are to be utilized to aid schoolchildren in the process of desegregating a public school system does not mean, however, that they are also to be utilized to further the claims of individual teachers who were allegedly dismissed because of racial discrimination. Although a schoolchild's right to integrated education can be said to depend in part on an integrated faculty, it does not depend on the outcome of individual suits by teachers for reinstatement and back pay.

That the authority given the Attorney General does not encompass every aspect of

racial discrimination in the schools is further indicated by the definition of desegregation. As appears above, § 2000c–6 authorizes suits in order to "materially further the orderly achievement of desegregation in public education." "Desegregation", as defined in § 2000c–6, "means the assignment of students to public schools" in a nondiscriminatory manner. If the statute were intended to give the broad authority advocated by the United States it is unlikely that the definition of desegregation would have been limited to the "assignment of students."

Additionally it is clear that suits on behalf of students are to be instituted only where they do not have and cannot secure the necessary means to bring the suit themselves. Certification by the Attorney General to this effect is required. As explained by Senator Humphrey:

> The purpose of the requirement that the Attorney General first find that the injured party is unable to bring suit is to assure that the Federal Government is not involved when private parties are able to undertake necessary legal action.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> In short, we are still relying on private litigation as the first line of action to make constitutional rights effective.
>
> Schwartz, p. 1210.

If the United States can also act on behalf of teachers, it is peculiar that no such certification is required as to them. The explanation of this inconsistency, we believe, is that the authority of the Attorney General was not intended to encompass the claims of individual teachers.

■ It is true that courts in equity have been held to have the power to grant all necessary relief. The remedies traditionally available to a court in equity are not to be restricted unless, of course, a statute mandates it. See, *Mitchell v. Demario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), and *Porter v. Warner Co.,* 328

---

1. In excess of 7000 pages in the Congressional Record were devoted to the debate in the Senate. Bernard Schwartz, the author of *Statutory History of the United States, Civil Rights,* has written a comprehensive analysis of all the proceedings, quoting pertinent parts of the debates in the Senate and House. References are to Schwartz unless otherwise indicated.

U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). But it is of course implicit in such cases that the matter at issue be properly before the court. In other words, before the question of what is the proper relief to be granted is reached, it must appear that there is no jurisdictional bar to the action. Yet it is exactly this latter question that is here at issue. If the United States is properly before the Court with its supplemental motion for relief, we have no doubt that the remedies of reinstatement and back pay are available. However, as explained above, the Court finds that the United States is not authorized under § 2000c–6 to act on behalf of the teachers, and therefore it is not necessary to determine what relief would be appropriate if there was that authority.

▮ The United States in its brief cites *United States v. Chesterfield County School Dist., S.C.,* 484 F.2d 70 (4 Cir. 1973), in support of its argument that it does have proper authority. *Chesterfield* was a desegregation case under Titles IV and VI of the Civil Rights Act. The United States made a motion for supplemental relief seeking reinstatement, back pay, and damages for ten black teachers allegedly dismissed for racial reasons. The district court denied relief but the Court of Appeals reversed as to nine of the ten teachers and ordered that they be reinstated with back pay. However, an examination of the briefs on appeal shows that the issue of whether the United States had authority to proceed on behalf of the teachers was never raised, nor was this question dealt with by either the district court or the Court of Appeals. Therefore *Chesterfield* cannot be held to have decided this question.

## STATUS OF CLASS ACTION

▮ The question of whether this case should be certified as a class action is also before the Court. Certain language in the opinion of the Court of Appeals suggests that it considered to be a class action.[2]

However, before remand no attempt was made either to certify the class as contemplated by FRCP 23(c)(1) or to identify the members of the class as required by 23(c)(3). Therefore when this case went up on appeal, it could not properly be considered a class action. *Bd. of School Commissioners of City of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975).

Upon remand to this Court from the Court of Appeals counsel for plaintiffs Syvalius Walston, et al., filed, on January 15, 1975, a motion to have the Court "determine that the action is maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, and to certify the class as being all black teachers terminated or refused reemployment for reason of the National Teachers Examination and all black teachers who are now employed or may in the future be employed or be eligible for employment." After a hearing on February 14, 1975, the motion was denied with the order being entered on March 28, 1975.

The possible members of a class suit would be (1) those teachers whose employment was terminated solely because of the NTE, (2) those teachers whose employment was terminated for cause and (3) applicants seeking positions as teachers. At the February 14 hearing counsel for plaintiffs explained that "[Mr. Benton] We are not raising the issue of teachers who were terminated for cause, because we don't think that the requirement of typicality would cover those people in certifying it as a class action." (p. 15) Therefore only teachers dismissed because of the NTE and applicants are sought to be made members of the class. The Court does not agree, however, that a class action is properly maintainable even if restricted to those two groups.

▮ The Court first of all believes the motion for certification was not timely. Plaintiffs commenced this suit on August 20, 1971, and it was not until January 15,

---

**2.** The opinion by Mr. Justice Clark states: "No. 73–1492 was filed against the Board on August 20, 1971, by thirteen black teachers as individuals and on behalf of the class represented by them." 492 F.2d at 919.

1975, and after an appeal on the merits had been taken that the motion was filed. Rule 23(c)(1) provides in part: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Clearly no attempt was made by the plaintiffs to bring this matter "as soon as practicable" before the Court for a determination. The responsibility for this, as well as the burden of proving the prerequisites of a class action, rests upon the plaintiffs. "Not only is the burden of proof on the plaintiff, it is the duty of the plaintiff to bring the matter before the court for a determination in accordance with Rule 23(c)(1). *Adise v. Mather,* 56 F.R.D. 492 (D.Colo.1972)." [3] *Carracter v. Morgan,* 491 F.2d 458, 459 (4 Cir. 1973); *Nance v. Union Carbide Corp.,* 540 F.2d 718 (4 Cir. 1976), decided July 28, 1976.

More important in this case than the fact of a delay of some four years and five months is the fact that a ruling on the merits by the Court of Appeals has intervened. Having won a favorable ruling from the Court of Appeals, the plaintiffs now wish to broaden the class of plaintiffs. To do so, the Court believes, would be improper. The language of Rule 23(c)(1) itself would seem to preclude such action. The second sentence of Rule 23(c)(1) states: "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." As the Court of Appeals for the Seventh Circuit has noted:

. . . [T]he text certainly implies, even if it does not state expressly, that such a decision should be made in advance of the ruling on the merits. For the explicit permission to alter or amend a certification order before decision on the merits plainly implies disapproval of such alteration or amendment thereafter. *Jimenez v. Weinberger,* 523 F.2d 689, 697 (7 Cir. 1975) [4]

Secondly, the policy behind Rule 23 is to avoid

. . . [T]he problem of "one-way intervention" whereby a potential class member could await a resolution of the merits of the claim before deciding whether or not to join the lawsuit. *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 545–49, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). The Court in that case specifically pointed out that:

> [T]he 1966 amendments were designed, in part, specifically to amend this perceived defect in the former Rule and to assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments. 414 U.S. at 547, 94 S.Ct. at 763 (footnote omitted).

The obvious import of this language is that the amended Rule 23 *requires* class certification prior to a determination on the merits. *Peritz v. Liberty Loan Corp.,* 523 F.2d 349 (7 Cir. 1975) [5]

**3.** In *Adise v. Mather* the court considered a 21 month delay between commencement of the action and filing of the motion for class action determination to be too long. "Delay in bringing the class action question before the Court delays the pretrial proceedings and the ultimate disposition of the litigation. Such has been the result in the instant case. We cannot and should not condone the delay." 56 F.R.D. at 492.

**4.** In *Jimenez* the district court had granted class relief after the original judgment by a three-judge court in favor of the defendants had been reversed by the Supreme Court. No class certification had been granted prior to the appeal. The Court of Appeals ruled that the district court's "class determination, although

untimely, was not erroneous." 523 F.2d at 702. The Court noted that although policy favored enforcing the provisions of Rule 23(c)(1), the Rule offered some flexibility and on the particular facts of the case the district court's ruling was not erroneous. It was important that the prerequisites to a class action described in Rule 23(a) were clearly met and that there was no difference in the claims of the original plaintiffs and those of the class members. For the reasons discussed *infra,* neither of these circumstances is present in our case.

**5.** In *Peritz* the district judge delayed deciding the class action issue until after a jury trial on the merits, at which time he granted certification. The Court of Appeals held that this was error because Rule 23 did not permit such a

For these reasons the Court finds the plaintiffs' motion for class action certification to be untimely.

▮ Moreover the Court finds this suit is not properly maintainable as a class action because the prerequisites set forth in Rule 23(a) have not been met. As stated above, plaintiffs wish to include as members those teachers, other than named plaintiffs, who were dismissed because of the NTE, plus those who applied for teacher positions. As to the former category, there has been no showing that "the class is so numerous that joinder of all members is impracticable." Rule 23(a)(1). As to how many individuals would be involved, counsel for plaintiffs stated at a December 27, 1974 hearing that "[Mr. Benton] I think, secondly, that the number of people we are talking about is not a large number. It may be somewhere in the neighborhood of three to eight people." At the February 14, 1975 hearing on the class action issue counsel stated in addition that "[Mr. Benton] First, those three to eight people were those terminated in '71 along with these plaintiffs, but there are others after '71. [The Court] How many are there in the group? [Mr. Benton] I don't know." The burden is upon the plaintiffs to show that the case meets the prerequisites of a class action. *Carracter v. Morgan,* 491 F.2d 458 (4 Cir. 1973), *Poindexter v. Teubert,* 462 F.2d 1096 (4 Cir. 1972). As to the numerosity requirement for teachers dismissed because of the NTE, that burden has not been met.

▮ Plaintiffs also wish to include as class members those individuals who applied for teacher positions. Since as stated above the requirement of an NTE score was abolished as a result of the Court of Appeals' decision, the possible class members would be those applicants who were unsuccessful in gaining employment before the date of the decision. However, individuals who were seeking employment but who were not successful and those who were already employed but whose employment

was terminated are in substantially different positions. The requirement of Rule 23(a)(3) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The claim of an applicant would be that he or she would have been hired but for the use of the NTE. Plaintiffs, on the other hand, are individuals who already held teaching positions but were among those who lost their jobs when the black faculty was disproportionately reduced. The burden of proof for the two groups might well be different. *Chambers v. Hendersonville City Board of Education,* 364 F.2d 189 (4 Cir. 1966), relied upon in the Court of Appeals' opinion, went no further than to shift the burden for those employed teachers who lost their jobs when the number of black teachers was drastically reduced as a result of desegregation.

Furthermore the class relief to be afforded applicants whose claims eventually proved meritorious would in all probability be different from the relief to be afforded successful plaintiffs. While reinstatement is a proper remedy for certain plaintiffs, the Court could not automatically order the school board to hire previous applicants regardless of such factors as the number of vacancies available and the qualifications of the individuals involved. Because of these differences, we find that the claims of plaintiffs are not typical of the claims of the class of applicants.

To conclude, the Court finds that the motion for class certification is not timely, nor have the prerequisites of Rule 23(a) been met. The motion must therefore be denied.

### ATTORNEYS' FEES

▮ Plaintiffs in No. 472–71–N request that an award of attorneys' fees be made. In accordance with *Alyeska Pipeline Service Co. v. Wilderness Soc.,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), the plaintiffs to

---

delay. The Court, however, noted that: "We need not decide whether in all cases Rule 23(c) would bar certification subsequent to a decision on the merits." Footnote 4, 523 F.2d at 354.

be awarded attorneys' fees must find statutory authority (unless they can fall within the court created exceptions such as bad faith or willful disobedience of a court order, which are inapplicable here). The plaintiffs are suing under 42 U.S.C. § 1983 which does not provide for attorneys' fees. However, they rely on 20 U.S.C. § 1617 which states:

§ 1617. Attorney fees

Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, *or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education,* the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

(Emphasis added)

■ A teacher's dismissal because of racially discriminatory criteria violates the Fourteenth Amendment and pertains to elementary or secondary education. Moreover the suit was necessary for the individual teachers to obtain relief. An award is therefore proper in this case. See *Ward v. Kelly,* 515 F.2d 908 (5 Cir. 1975).

The Supreme Court in discussing 20 U.S.C. § 1617 stated that the successful plaintiff "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Northcross v. Board of Educ. of Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). Although the effective date of 20 U.S.C. § 1617 was July 1, 1972, the statute applies retroactively to legal proceedings before that date. *Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

During the course of the remand proceedings certain settlements were effected as follows:

| | |
|---|---|
| Queen H. Malone | $6500.00 |
| Dorothy D. Mozelle | 4270.00 |
| Celestine E. Whitehead | 1837.00 |
| Darline C. Boone | 8000.00 |
| Evelyn J. Jones | 1650.00 |
| Josephine A. Gatling | 2205.00 |
| Thelma L. Corprew | 200.00 |
| Eula Y. Baker | 1500.00 |

The foregoing are eight of the named thirteen plaintiffs in No. 472–71–N. One other, Brenda S. Williams, offered no proof of damages and her case is dismissed. In addition, Clara E. Lee, on her own motion, was dismissed as a party plaintiff on March 13, 1972. The remaining three plaintiffs' cases are the subject of further discussion.

■ Two Government claimants (not parties in No. 472–71–N) settled their claims. Amanda Robinson settled for $750.00 with no claim for attorney's fee. After the case had been fully submitted, the Court received a letter from a Government attorney stating that the claim of Flora Ricks had been settled for an amount not designated. The Ricks settlement is not subject to a claim for attorneys' fees.

■ When the settlements were announced in open court, the Court raised the question of attorneys' fees. After some consideration the school board agreed that, if allowable by law, the board would pay a reasonable fee in addition to the settlement amounts. Bearing in mind the appeal heretofore successfully pressed, the Court is of the opinion that attorneys' fees in the sum of twenty (20) percent of the stated settlements should now be paid to counsel for the named plaintiffs in No. 472–71–N. With respect to Howell, who is a named plaintiff deemed entitled to recover as hereinafter stated, the Court allows twenty-five (25) percent in addition to the damage recovery.[6]

---

**6.** We are not unmindful of the number of hours claimed by plaintiffs' counsel. Compensation on an hourly rate would greatly exceed the amount received by way of a percentage of the

As indicated above, no fees are allowed for the settlement of the Robinson and Ricks claims. Presumably all settlements previously stated have been paid to the named plaintiffs and two Government claimants. And, with the exception of Howell whose case was not settled, we assume further that the settling plaintiffs have waived any right to reinstatement although the terms of the settlements as stated in open court make no reference to reinstatement.

## INDIVIDUAL CLAIMS

The Court now turns to the merits of the individual claims of the remaining plaintiffs. Although recovery for the two remaining Government plaintiffs, Wallace Dickerson and Elizabeth Pegram, is precluded by the Court's ruling on the lack of authority of the United States to proceed on their behalf, the facts of their claims will also be discussed.

### Syvalius Walston

Walston was first employed as a teacher in 1961 in Nansemond County and, except for the 1962–63 school year when he was unemployed, continued to teach in various schools until his employment was terminated at the end of the 1970–71 school year. During the 1970–71 school year he was assigned to the Southwestern Elementary School where he taught health and physical education for seven weeks before being assigned by the principal, David Fulton who is also black, to teach seventh grade English.

Difficulties developed between Walston and Fulton over what the latter viewed as Walston's lack of "professional dedication."[7] In support of this view Fulton cited certain incidents in which he felt Walston improperly opposed the administration for reasons with racial implications.[8] It should be noted that Southwestern Elementary School was in its first year of racially integrated operation. Other incidents involved rather petty administrative disagreements.

In a letter to Robert Wood, Superintendent of the Nansemond County Schools, dated April 5, 1971, Fulton recommended Walston for reappointment for the next school year. At a principals' meeting on April 8 Wood cautioned the principals against recommending a teacher and then requesting that the teacher be transferred. Wood felt principals sometimes did this as an easy method of getting rid of unwanted teachers, so he told them that if they made a recommendation they should not expect a transfer. In a letter to Wood dated April 9 Fulton changed his position and recommended that Walston not be reappointed. As a result Walston was not reemployed for the next school year.

In evaluating these happenings we first note that it is not the duty of the Court to pass on the merit or nonmerit of Fulton's recommendation. Rather the Court must determine whether Walston's race was the cause of his dismissal. We do not find this

total recovery. Nevertheless, any allowance of reasonable attorneys' fees must be proportionate with the recovery as to each plaintiff. To hold otherwise would result in litigation primarily for the benefit of attorneys.

7. Fulton filled out, on March 5, 1971, an "Evaluation of Personnel" form for Walston in which he rated him "outstanding" in one category (categories were related to personal and professional qualities and teaching performance), "above average" in two categories, "average" in ten categories, "below average" in one category, which was professional dedication, and "unsatisfactory" in no categories.

8. For example, Walston objected to the method by which children on the Honor Roll were selected because he felt no black children would be able to qualify. Fulton felt Walston continued unnecessarily to involve himself in the problem of stopping a bus driver from seating the children by race. Fulton stated that he was moving to correct the problem at the time but needed more time to handle such an explosive situation. Walston also objected when a black child, an apparent winner of a spelling bee, later lost to a white child as a result of an error made in conducting the contest.

to be the case. The NTE was not involved in respect to Walston.

Walston's dismissal was essentially due to a personality clash with his principal, Fulton. At the proceedings on April 3, 1972 the following exchange took place:

Q As a result, Mr. Fulton, of all the experience that you had with Mr. Walston, your observations of him, confrontations you had with him about various of these issues, what was your final judgment as to whether or not you and Mr. Walston could successfully work together in the proper administration of your school for another year?

A In my final judgment, Mr. Gray, I deemed that an almost impossible task; that we could not work together for the betterment of the school.

Q That was the basis for your recommendation of nonreemployment?

A Yes, sir.

On April 4 Walston testified as follows:

Q Do you agree that the two of you could not work together for the betterment of that school?

A Yes, I agree with that.

Q You agree with that?

A Yes.

Q And did you think that one or the other of you would have to change if you were to work together for the betterment of that school?

A I agree with that.

Q And did you think that it was you that should change or did you think that it was Mr. Fulton that should change?

A I thought that he should change.

Q And you regarded Mr. Fulton as unreasonable?

A Yes, I did.

Q Inflexible?

A True.

Q Untrustworthy?

A Right.

Q And somewhat dictatorial?

A Very much so.

■ As before stated, Fulton's race is black, as is true of the teacher who replaced Walston. The fact that some of the incidents cited by Fulton in support of his refusal to recommend Walston had racial implications does not show that it was the race of Walston, rather than the incidents themselves, which caused Walston's employment to be terminated. We find that the school board has met its burden of showing that Walston was not dismissed because of his race.

### George Crocker

Crocker taught continuously in Nansemond County from 1959 until the end of the 1969–71 school year at which time his employment was terminated, but not because of the NTE. James Harris, who is also black, was Crocker's principal at East Suffolk Elementary School where Crocker taught from 1966 until his employment ended.

Harris testified that Crocker had problems with student discipline; in particular he sent too many students to the principal's office for punishment. The two differed in their philosophies of discipline and Crocker felt he was not getting the proper support from Harris because the latter too often would not punish the students sent to him. Crocker also had personal difficulties with Harris and because of this he had requested a transfer in 1969.

At the proceedings on April 24, 1975 Crocker was questioned about the reasons why his teaching contract was not renewed.

Q Do you have any reason to believe, of your own knowledge, that you were discharged from a renewal of your contract because of any reason other than the fact that you were not able to get along with your Principal, and that you were having disciplinary problems?

A Do I know of any other reason?

Q Yes.

A No, I don't know of any other reason.

■ We believe the record shows that race played no part in the termination of Crocker's employment and the school board

has sufficiently established a valid reason for termination.

### Roumaine Howell

Defendants in their brief acknowledge liability for Mrs. Howell who seeks both reinstatement and back pay. She last taught during the 1970–71 school year at John Yeates High School where her salary was $7,808.00. The pretrial order contains the stipulation that her salary would have been as follows:

| 1971–72 | $ 8,308.00 |
|---------|-----------|
| 1972–73 | $ 8,765.00 |
| 1973–74 | $ 9,291.00 |
| 1974–75 | $10,350.00 |

After her employment was terminated she obtained a $7,000.00 loan at 7% interest for house repairs mostly, and thus she seeks an additional $490.00 for her interest payments.

Her earnings for those years were as follows:

| 1971 | $ 50.00 |
|------|---------|
| 1972 | $ 25.00 |
| 1973 | $ 891.00 |
| 1974 | $1,566.00 |

She commuted 64 miles per day to get to and from work. Hence defendants argue that any recovery should be reduced by 64 miles per day x 180 days x 12 cents per mile = $1,382.40 per year.

Defendants also point to her testimony on April 3, 1972 where she stated she had not applied anywhere to teach for the 1971–72 school year. However, on April 24, 1975, she mentioned about half a dozen job applications she had made in 1971. Her testimony was that she failed to mention them in 1972 because she could not recall the dates of the applications.

 We think that there must be some reasonable limitation to claims for damages by reason of back pay where a supposedly competent school teacher is not reemployed for succeeding years. We are convinced that Mrs. Howell did not exercise proper efforts to secure employment during the years beginning 1971–72. Taking her highest rate of pay ($10,350.00 for 1974–75), we have commuted her loss at $20,700 for

which judgment will be entered in her favor. She is, according to the ruling of the Court of Appeals, entitled to reinstatement conditioned that she makes immediate application for same. The request should come from Mrs. Howell as neither the school board nor the Court is advised as to her present wishes along these lines.

The attorneys' fees allowed are in addition to the aforesaid $20,700.00.

### Wallace Dickerson

Dickerson was employed by the Nansemond County School Board during the 1969–70 and 1970–71 school years. During his first year Dickerson taught biology at Southwestern High School and during his second year he taught physical education at three different schools, one of which was Southwestern. His principal at Southwestern was David Fulton who, as previously noted, is black. As a result of Fulton's decision not to recommend reappointment, Dickerson's employment was terminated at the end of the 1970–71 school year, the NTE not being involved.

Fulton testified that there were several reasons for his decision. Dickerson failed to ever turn in weekly lesson plans which were requested of all teachers. He failed to follow through with requests by Fulton to reorganize his physical education classes, to take measures to prevent theft during classes, to refrain from entertaining visitors during the school day, and to improve in the area of student discipline. Dickerson was also unwilling to stay after school to try and correct certain teaching weaknesses which Fulton observed.

As was the case with Syvalius Walston, Fulton at first recommended Dickerson for reappointment; then, after the April 8, 1971 principals' meeting, changed his mind and recommended that he not be reappointed. As discussed above, at that meeting the principals were advised by Superintendent Wood to give honest recommendations because if they recommended that a teacher be retained, they could not later get rid of the teacher by means of requesting a trans-

fer. This meeting, rather than racial discrimination, was the reason Fulton changed his recommendations as to both Dickerson and Walston.

 The record shows that Dickerson's race was not a factor in the decision not to reemploy him. As noted, Dickerson was a "Government claimant" and not a named plaintiff in the *Walston, et al.* case.

### Elizabeth Pegram

Ms. Pegram was employed by the Nansemond County School Board as a mathematics teacher during the 1970–71 school year. She did not return for the 1971–72 school year because of pregnancy, her child being born in October of 1971, although she testified that she could have returned to teach by March of 1972.

An "Evaluation of Personnel" form filled out by her principal, William Boone, on March 15, 1971, shows her marked "outstanding" in no categories, "above average" in five categories, "average" in eight categories, "below average" in one category (student discipline) and "unsatisfactory" in no categories. In the same form Boone checked the "recommend reappointment" option at the bottom of the page.

At the proceedings on April 25, 1975 Boone, who is also black, testified that he recommended her for reappointment only because he was reasonably certain that, because of her pregnancy, she would not be able to return for the 1971–72 school year. If he had not been reasonably certain of this, he would not have recommended her because he regarded her as deficient in the areas of student discipline and academic ability. Boone testified, however, that he did not wish to kill her chances for employment elsewhere and hence he made the favorable recommendation and evaluation outlined above.

In addition, in late March or early April of 1971, she received a letter from the school board stating that due to her failure to score 500 on the NTE she would not be reemployed for the 1971–72 school year.

 Ms. Pegram did not apply for reemployment for the 1972–73 school year, which is the first year she would have been able to return after her pregnancy. Under the circumstances the Court believes that her failure to apply precludes recovery. Ms. Pegram was a newly employed teacher who taught for only one year (1970–71). She did not return for the 1971–72 school year because of her pregnancy. Her failure to apply for the 1972–73 school year meant that the school board was not faced with the decision of whether or not to hire her for that year. Consequently recovery on the grounds of a refusal of employment for racially discriminatory reasons is not justified even if Pegram had been a named plaintiff in the case of *Walston, et al.*

### CONCLUSION

The Court's attention has recently been directed to *Monell v. Dept. of Soc. Service of City of New York*, 532 F.2d 259 (2 Cir. 1976). While this case would be very important on the issue of subject matter jurisdiction involving back pay (but not reinstatement), the Court is obliged to follow the mandate issued by the United States Court of Appeals for the Fourth Circuit. While this issue not heretofore raised may probably be raised at any stage of the proceedings, it is inappropriate for this Court to disobey the mandate of the Court of Appeals and its prior opinion. Assuming an appeal is taken by some party, the question may be presented to the appellate court.

Defendants will pay the taxable costs.

A judgment order will be entered in accordance with the foregoing memorandum. Counsel for Walston, et al., will prepare and circulate the order for endorsement of counsel prior to final presentation to the Court for entry.